**TENNECO, INC., Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

No. 1220, Docket 81–4225.

United States Court of Appeals, Second Circuit.

Argued May 20, 1982.
Decided Sept. 16, 1982.

John L. Jeffers, Houston, Tex. (Alan Gover, Baker & Botts, Houston, Tex., of counsel), for petitioner.

Howard E. Shapiro, Deputy Gen. Counsel, F.T.C., Washington, D.C. (John H. Carley, Gen. Counsel, F.T.C., David C. Shonka, Washington, D.C., of counsel), for respondent.

Before MANSFIELD, MESKILL and PRATT, Circuit Judges.*

MESKILL, Circuit Judge:

Tenneco, Inc. ("Tenneco") petitions pursuant to 15 U.S.C. § 45(d) (1976)[1] for re-

---

* When this appeal was heard, Judge Pratt was a United States District Judge for the Eastern District of New York, sitting by designation. He was inducted as a judge of this Court on June 29, 1982.

1. 15 U.S.C. § 45(d) (1976) provides:

Upon the filing of the record with it the jurisdiction of the court of appeals of the United States to affirm, enforce, modify, or set aside orders of the Commission shall be exclusive.

view of a final order of the Federal Trade Commission ("Commission") requiring its divestiture of Monroe Auto Equipment Co. ("Monroe") and prohibiting it from making certain acquisitions for a ten-year period.[2] The Commission, in reversing a decision of

2. The Commission's order, dated Sept. 23, 1981, reads as follows:

### FINAL ORDER

This matter having been heard by the Commission upon the appeal of complaint counsel from the initial decision, and upon briefs and oral argument in support thereof and in opposition thereto, and the Commission for the reasons stated in the accompanying Opinion having determined to reverse in part the initial decision:

IT IS ORDERED that the initial decision of the administrative law judge be adopted as the Findings of Fact and Conclusions of Law of the Commission, except to the extent it is inconsistent with the accompanying Opinion. Other Findings of Fact and Conclusions of Law of the Commission are contained in the accompanying Opinion.

IT IS FURTHER ORDERED that the following order to divest be, and it hereby is, entered:

### I.

IT IS ORDERED that respondent, Tenneco, Inc. (hereinafter "Tenneco"), a corporation, and its officers, directors, agents, representatives, employees, subsidiaries, affiliates, successors and assigns, shall divest all stock, assets, title, properties, interest, rights and privileges, of whatever nature, tangible and intangible, including without limitation all buildings, machinery, equipment, raw material reserves, inventory, customer lists, trade names, trademarks, and other property of whatever description acquired by Tenneco as a result of its acquisition of Monroe Auto Equipment Company (hereinafter "Monroe") together with all additions and improvements to Monroe subsequent to the acquisition. Such divestiture shall be absolute, shall be accomplished no later than one (1) year from the service of this Order, and shall be subject to the prior approval of the Federal Trade Commission.

### II.

IT IS FURTHER ORDERED that such divestiture shall be accomplished absolutely to an acquirer approved in advance by the Federal Trade Commission so as to transfer Monroe as a going business and a viable, competitive, independent concern.

### III.

IT IS FURTHER ORDERED that pending any divestiture required by this Order, respondent shall not knowingly cause or permit the deterioration of the assets and properties specified in Paragraph I in a manner that impairs the marketability of any such assets and properties. Respondent may but shall not be required to make capital expenditures for the improvement of any such assets and properties.

### IV.

IT IS FURTHER ORDERED that pursuant to the requirements of Paragraph I, none of the stock, assets, properties, rights, privileges and interests of whatever nature, tangible or intangible, acquired or added by Tenneco, shall be divested, directly or indirectly, to anyone who is at the time of the divestiture an officer, director, employee or agent of, or under the control, direction or influence of Tenneco or anyone who owns or controls, directly or indirectly more than one (1) percent of the outstanding shares of the capital stock of Tenneco or to anyone who is not approved in advance by the Federal Trade Commission.

### V.

IT IS FURTHER ORDERED that for a period of ten (10) years from the date this Order becomes final, Tenneco shall cease and desist from acquiring, or acquiring and holding, directly or indirectly, through subsidiaries or otherwise, without the prior approval of the Federal Trade Commission, the whole or any part of the stock, share capital, assets, any interest in or any interest of, any concern, corporate or noncorporate, engaged in the business of manufacturing, distributing, or selling, shock absorbers, nor shall Tenneco for a period of ten (10) years from the date this Order becomes final enter into any agreement, understanding or arrangement with any such concern by which Tenneco obtains the market share, in whole or in part, of such concern in the above described product lines, without the prior approval of the Federal Trade Commission.

### VI.

IT IS FURTHER ORDERED that within sixty (60) days from the effective date of this Order and every sixty (60) days thereafter until it has fully complied with Paragraph I of this Order, Tenneco shall submit a verified report in writing to the Federal Trade Commission setting forth in detail the manner and form in which it intends to comply, is complying or has complied therewith. All such reports shall include, in addition to such other information and documentation as may hereafter be requested, (a) a specification of the steps taken by Tenneco to make public its desire to divest Monroe, (b) a list of all persons or organizations to whom notice of divestiture has been given, (c) a summary of all discussions and negotiations together with the identity and address of all interested persons or organizations, and (d) copies of all reports, internal memoranda, offers, counteroffers, communications and correspondence concerning said divestiture.

an Administrative Law Judge ("ALJ"), found that Tenneco's 1977 acquisition of Monroe violated Section 7 of the Clayton Act, 15 U.S.C. § 18 (1976),[3] by eliminating potential competition in the market for replacement automotive shock absorbers. We grant Tenneco's petition for review and set aside the Commission's order.

## A. BACKGROUND

### I. *The Companies*

Tenneco is a diversified corporation whose operations include the manufacture and distribution of automotive parts. In 1975, Tenneco was the fifteenth largest industrial corporation in the United States with over $6.58 billion in assets and revenues exceeding $5.63 billion. Tenneco's Walker Manufacturing Division ("Walker"), which was responsible for Tenneco's automotive parts operations at the time of the events giving rise to this case, was the nation's leading seller of exhaust system parts in 1975 and 1976. Walker also manufactured hydraulic jacks, air jacks, mechanical scissors jacks, oil seals and automotive filters. Walker distributed steering dampers and other automotive parts through a subsidiary. Walker's exhaust system parts business accounted for most of its revenues.

Monroe, which was established before World War II, has become a leading manufacturer of automotive shock absorbers. Monroe has concentrated its operations on production of replacement shock absorbers: In fiscal 1976, for example, over 80% of Monroe's output was sold for use as replacement equipment for worn or damaged shock absorbers. *See* section A. III, *infra.*

The company experienced significant growth during the 1960s and early 1970s, but suffered decreased earnings in the years immediately preceding its acquisition by Tenneco. The parties offer conflicting explanations for Monroe's financial downturn and somewhat differing predictions of Monroe's future.

### II. *The Product*

Automotive shock absorbers facilitate vehicle control "by keeping the wheels on the road, reducing sway and roll on curves, reducing bottoming, dampening vibrations, [and] controlling wheel hop." ALJ's Findings, J. App. at 70, ¶ 26. In addition, they increase driving comfort by "smoothing the ride." *Id.* Shock absorbers consist of one or more steel tubes which contain a hydraulic cylinder, a piston and a rod which move through the cylinder, hydraulic valves and fluid, springs, seals and bearings. Although they take several forms, all shock absorbers perform similar functions. A conventional shock absorber is mounted vertically between the vehicle body and a wheel. The same is true of McPherson strut shock absorbers (or "struts"), a relatively new design combining the shock absorber with other portions of the vehicle's suspension. The McPherson strut has become increasingly popular, especially for small cars, because its wheel suspension method is more compact than conventional designs. Steering dampers, another form of shock absorber, are mounted horizontally between the front wheels of a vehicle. Steering dampers are designed to dampen road shocks and oscillations in the steering system and differ from conventional shocks principally in mounting hardware.

---

VII.
    IT IS FURTHER ORDERED that Tenneco shall notify the Commission at least thirty (30) days prior to any proposed changes which may affect compliance obligations arising out of the Order, such as dissolution, assignment or sale resulting in the emergence of successor corporations, and that this Order shall be binding in any such successor. J. App. 188-90.

**3.** Section 7 of the Clayton Act provides in pertinent part:

No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly. 15 U.S.C. § 18 (1976).

## III. *The Market*

Shock absorbers are distributed through two distinct channels: the original equipment channel and the replacement channel. The original equipment channel consists of sales to manufacturers for use on new vehicles. The replacement channel consists of sales to outlets that install shock absorbers on vehicles already in use as replacements for worn or damaged equipment.

In the years relevant to this case, the replacement channel was highly concentrated, with the four leading manufacturers accounting for over 90% of total sales in both 1975 and 1976: Monroe, the number two firm, and Maremont, the parent company of industry leader Gabriel, collectively accounted for over 77% of replacement shock absorber sales in 1976; Questor and General Motors together accounted for approximately 15% of sales in the same year. Gabriel, Monroe, Questor and General Motors have occupied the top four positions in the replacement market at least since the late 1960s, with Monroe holding either the first or second position since the beginning of that decade.

Substantial barriers, the most significant of which may be economies of scale in the industry, discourage entry into the market for replacement shock absorbers. The parties agree that a shock absorber plant operating at minimum efficient scale would produce six million units annually, which is approximately 10% of total replacement shock absorber sales. Other barriers to entry include the need for technology and marketing skills peculiar to the industry and the significant time lags associated with establishing a plant and penetrating the market to the extent necessary to achieve a reasonable rate of return on investment.

## IV. *The Commission's Opinion*

Against the background outlined above, the Commission concluded that the relevant market for antitrust analysis was the market for replacement shock absorbers, including conventional shock absorbers, McPherson struts and steering dampers. While the Commission found that competitive performance in this highly concentrated market "improved substantially" "in the years just prior to the [Tenneco-Monroe] merger," it attributed the market's "improved economic performance" to "industry fears that Tenneco was likely to attempt entry." Commission Opinion at 13–14, J. App. at 203–04. In other words, the Commission believed that Tenneco was exerting an "edge effect" on the industry, causing existing manufacturers to compete aggressively in an attempt to discourage entry by Tenneco. The Commission concluded that once Tenneco acquired Monroe and was no longer perceived as a potential independent competitor, the "edge effect" disappeared. The Commission predicted that as a result manufacturers would revert to the anticompetitive, oligopolistic activities that typify competitors in a highly concentrated market. *Id.* The Commission also ruled that, in addition to this alleged "edge effect," which is grounded in industry perceptions, Tenneco was in fact likely to enter into the independent manufacture of replacement shock absorbers in competition with existing producers. This likelihood vanished upon the Tenneco-Monroe merger. For these reasons the Commission ruled that "the effect of [Tenneco's] acquisition [of Monroe] is likely to lessen competition substantially in the sale of replacement shock absorbers through the elimination of both perceived and actual potential competition in violation of both Section 7 of the Clayton Act and Section 5 of the Federal Trade Commission Act." [4] Commission Opinion at 68, J. App. at 258.

## B. DISCUSSION

Tenneco challenges both the Commission's definition of the relevant market and

---

4. *Section 5 of the Federal Trade Commission Act provides in pertinent part:*
    Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.
   15 U.S.C. § 45(a)(1) (1976).

its findings with respect to Tenneco's effect on that market as a potential competitor. The parties agree that our consideration of these issues is governed by the "substantial evidence" standard of review. Under that standard,

> the Commission's findings of fact, "if supported by substantial evidence, shall be conclusive," 15 U.S.C. § 21(c), and we may not substitute our inferences for those drawn by the Commission simply because we might have evaluated the facts differently as an original matter. See *FTC v. Pacific States Paper Trade Ass'n*, 273 U.S. 52, 63, 47 S.Ct. 255, [258] 71 L.Ed. 534 (1927); *Simeon Management Corp. v. FTC*, 579 F.2d 1137, 1142 (9th Cir. 1978). However, the Commission's findings must be supported by substantial evidence and there must also be a rational connection between those findings and its conclusions.

*Fruehauf Corp. v. FTC*, 603 F.2d 345, 351 (2d Cir. 1979).

Even assuming that the Commission's market definition is supported by substantial evidence, we hold that the Commission's findings on the elimination of potential competition are not. Accordingly, we do not address Tenneco's challenges to the market definition, but move directly to the potential competition issues.

## I. *The Clayton Act and Potential Competition*

█ The Supreme Court summarized the purpose of Section 7 of the Clayton Act and its relationship to the doctrine of potential competition in *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 531–32, 93 S.Ct. 1096, 1099–1100, 35 L.Ed.2d 475 (1973):

> Section 7 of the Clayton Act forbids mergers in any line of commerce where the effect may be substantially to lessen competition or tend to create a monopoly. The section proscribes many mergers between competitors in a market, *United States v. Continental Can Co.*, 378 U.S. 441 [84 S.Ct. 1738, 12 L.Ed.2d 953] (1964); *Brown Shoe Co. v. United States*, 370 U.S. 294 [82 S.Ct. 1502, 8 L.Ed.2d 510] (1962); it also bars certain acquisitions of a market competitor by a noncompetitor, such as a merger by an entrant who threatens to dominate the market or otherwise upset market conditions to the detriment of competition, *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 578–580 [87 S.Ct. 1224, 1230–1231, 18 L.Ed.2d 303] (1967). Suspect also is the acquisition by a company not competing in the market but so situated as to be a potential competitor and likely to exercise substantial influence on market behavior. Entry through merger by such a company, although its competitive conduct in the market may be the mirror image of that of the acquired company, may nevertheless violate § 7 because the entry eliminates a potential competitor exercising present influence on the market. *Id.*, at 580–581 [87 S.Ct. at 1231–1232]; *United States v. Penn-Olin Chemical Co.*, 378 U.S. 158, 173–174 [84 S.Ct. 1710–1718, 12 L.Ed.2d 775] (1964). As the Court stated in *United States v. Penn-Olin Chemical Co., supra*, at 174 [84 S.Ct. at 1718]. "The existence of an aggressive, well equipped and well financed corporation engaged in the same or related lines of commerce waiting anxiously to enter an oligopolistic market would be a substantial incentive to competition which cannot be underestimated."

As later explained by the Court in *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 624–25, 94 S.Ct. 2856, 2871–2872, 41 L.Ed.2d 978 (1974), the potential competition doctrine is divisible into two theories: perceived potential competition and actual potential competition. The Commission found that Tenneco had violated section 7 under both theories.

The Supreme Court has described the theory of perceived potential competition, which it has approved for application to cases brought under Section 7 of the Clayton Act, *see, e.g., Marine Bancorporation*, 418 U.S. at 625, 94 S.Ct. at 2871; *Falstaff Brewing Corp.*, 410 U.S. at 531–37, 93 S.Ct. at 1099–1103, as "the principal focus of the [potential competition] doctrine." *Marine*

*Bancorporation,* 418 U.S. at 624, 94 S.Ct. at 2871.

In developing and applying. the [perceived potential competition] doctrine, the Court has recognized that a market extension merger may be unlawful if the target market is substantially concentrated, if the acquiring firm has the characteristics, capabilities, and economic incentive to render it a perceived potential *de novo* entrant, and if the acquiring firm's premerger presence on the fringe of the target market in fact tempered oligopolistic behavior on the part of existing participants in that market. In other words, the Court has interpreted § 7 .as encompassing what is commonly known as the "wings effect"—the probability that the acquiring firm prompted premerger procompetitive effects within the target market by being perceived by the existing firms in that market as likely to enter *de novo.*

*Id.* at 624–25, 94 S.Ct. at 2871–2872.

The actual potential competition theory, which has yet to receive sanction from the Supreme Court or this Court, *see, e.g., id.* at 625, 639, 94 S.Ct. at 2871, 2878; *United States v. Siemens Corp.,* 621 F.2d 499, 504 (2d Cir. 1980), would

proscribe[ ] a market extension merger solely on the ground that such a merger eliminates the prospect for long-term deconcentration of an oligopolistic market that in theory might result if the acquiring firm were forbidden to enter except through a *de novo* undertaking or through the acquisition of a small existing entrant (a so-called foothold or toehold acquisition).

*Marine Bancorporation,* 418 U.S. at 625, 94 S.Ct. at 2871.

The theory of the [actual potential competition] doctrine is that competition in the market would be enhanced by the addition of the new competitor and therefore the elimination of such a potential competitor would substantially lessen competition within the meaning of § 7.

*Siemens Corp.,* 621 F.2d at 504.

The Commission established two independent grounds on which to base its ruling that Tenneco's acquisition of Monroe violated section 7 by finding that the acquisition eliminated both actual and perceived potential competition in the market for replacement shock absorbers. Tenneco challenges both grounds, arguing that the record is inadequate to support the factual findings underlying them. We will discuss the substantiality of the evidence underlying both halves of the Commission's case, addressing first the findings relating to actual potential competition.

## II. *Actual Potential Competition*

To establish a violation of section 7 in this case based upon the elimination of actual potential competition, assuming for the moment that the doctrine is valid, the Commission must show: (1) that the relevant market is oligopolistic; (2) that absent its acquisition of Monroe, Tenneco would likely have entered the market in the near future either *de novo* or through toehold acquisition; and (3) that such entry by Tenneco carried a substantial likelihood of ultimately producing deconcentration of the market or other significant procompetitive effects. *See Marine Bancorporation,* 418 U.S. at 630, 633, 94 S.Ct. at 2874, 2875; *Siemens Corp.,* 621 F.2d at 505; *BOC International Ltd. v. FTC,* 557 F.2d 24, 29 (2d Cir. 1977). Tenneco argues that the Commission's findings on the relevant market and the likelihood of entry lack substantial record support.

▮ Tenneco's challenges to the Commission's conclusion that the market for replacement shock absorbers was oligopolistic are not persuasive. Tenneco concedes that the concentration ratios in the market, "the primary index of market power," *Brown Shoe Co. v. United States,* 370 U.S. 294, 322 n. 38, 82 S.Ct. 1502, 1522 n. 38, 8 L.Ed.2d 510 (1962), were extraordinarily high during the relevant period: Four-firm concentration was over 90% and two-firm concentration was over 77%. Brief for Tenneco at 18. This fact alone "established a prima facie case that the ... market was a candidate for the potential-competition doctrine."

*Marine Bancorporation,* 418 U.S. at 631, 94 S.Ct. at 2874. Therefore, it was Tenneco's burden to show that these high concentration ratios did not accurately reflect the competitive conditions in the market. *Id.* Tenneco, however, showed only that in 1974 the market for replacement shock absorbers suffered from decreased earnings apparently caused by falling prices, suggesting a more competitive market than the high concentration ratios would reflect. Tenneco argues that this evidence of increased competition, combined with the Supreme Court's warning that high concentration ratios are not alone conclusive, *United States v. General Dynamics Corp.,* 415 U.S. 486, 498, 94 S.Ct. 1186, 1194, 39 L.Ed.2d 530 (1974); *see Brown Shoe Co.,* 370 U.S. at 321–22 & n. 38, 82 S.Ct. at 1521–1522 & n. 38, 8 L.Ed.2d 510, undermines the Commission's finding that the market for replacement shock absorbers was sufficiently concentrated and anticompetitive to justify application of the potential competition doctrine. We disagree.

The record establishes that the structure, history and probable future of the market for replacement shock absorbers—the factors that the Supreme Court identified as proper considerations in addition to concentration ratios, *General Dynamics Corp.,* 415 U.S. at 498, 94 S.Ct. at 1194; *Brown Shoe Co.,* 370 U.S. at 322 n. 38, 82 S.Ct. at 1522 n. 38, 8 L.Ed.2d 510—are all consistent with the Commission's finding. The extraordinarily high concentration ratios have remained stable over many years with the same firms occupying the top four positions since at least the late 1960s. Substantial barriers to entry severely limit the number of firms likely to provide additional competition. *See* section A. III, *supra.* The industry has been highly profitable, and despite recent indications that profit margins may be decreasing, industry experts, including Tenneco executives, foresee a bright future. Based upon this evidence, the Commission was fully justified in concluding that the replacement shock absorber market was not genuinely competitive and in proceeding to assess Tenneco's effects on that market.

Nevertheless, we reject the Commission's finding that Tenneco was an actual potential entrant likely to increase competition in the market for replacement shock absorbers. The record lacks substantial evidence supporting the Commission's finding that Tenneco was likely to have entered the market for replacement shock absorbers in the near future either *de novo* or through toehold acquisition. *See Marine Bancorporation,* 418 U.S. at 633, 94 S.Ct. at 2875; *Siemens Corp.,* 621 F.2d at 505; *BOC International Ltd.,* 557 F.2d at 29.

The record contains abundant evidence that Tenneco had both the interest and the incentive to enter the market for replacement shock absorbers. The Commission relied upon internal Tenneco and Walker documents identifying shock absorbers as complementary to Walker's exhaust system products line and urging entry into the shock absorber market. In addition, uncontradicted evidence revealed that Tenneco had negotiated with major European shock absorber manufacturers regarding possible acquisitions or license arrangements and had actually acquired a small manufacturing company that held a patent on a new shock absorber design. The record strongly supports the conclusion that Tenneco was actively considering entry into the market and was pursuing all leads to that end at least since the late 1960s or early 1970s. Moreover, Tenneco clearly possessed adequate financial resources to make the large initial investment needed to attempt to penetrate the market. The record, however, is deficient in evidence that there were viable toehold options available to Tenneco or that Tenneco would have entered the market *de novo.*

The Commission conceded in its opinion that Tenneco never expressed any interest in entering the market for replacement shock absorbers "on a completely *de novo* basis." Commission Opinion at 57, J. App. at 247. However, the Commission found that Tenneco had expressed interest in entering the market essentially *de novo,* building the required production facilities from

scratch and acquiring the necessary technology via a license from an established foreign shock absorber producer, *id.* at 57–58, J. App. at 247–48. The Commission concluded that Tenneco would likely have done so absent its acquisition of Monroe.

The Commission's reasoning is flawed. It ignores Tenneco's decision not to enter the market during the 1960s and early 1970s, a period of high profitability for shock absorber manufacturers, because of anticipated inadequate earnings during early years. The record is devoid of evidentiary support for the Commission's assertion that in the period relevant to this case, when industry earnings were in decline, Tenneco would have been willing to suffer the "cost disadvantage" inherent in the building of an efficient scale plant that would remain underutilized "for a number of years." Commission Opinion at 59 n. 61, J. App. at 249. The Commission's conclusion that Tenneco would have entered the market *de novo* with the aid of a license absent its acquisition of Monroe is based on the kind of unsupported speculation that the Supreme Court condemned when it warned that we should "remember[ ] that § 7 deals in 'probabilities,' not 'ephemeral possibilities.'" *Marine Bancorporation,* 418 U.S. at 622–23, 94 S.Ct. at 2870–2871 (quoting *Brown Shoe Co.,* 370 U.S. at 323, 82 S.Ct. at 1522).

The Commission's conclusion that Tenneco would likely have entered the replacement shock absorber market through toehold acquisition is similarly flawed. The Commission identified Armstrong Patents, Ltd. ("Armstrong"), a British shock absorber manufacturer, DeCarbon Shock Absorber Co. ("DeCarbon"), a French company, and Blackstone Manufacturing Corp. ("Blackstone"), a small United States producer of shock absorbers, as potential toeholds.[5] However, the record reveals that Tenneco

in fact negotiated unsuccessfully with Armstrong and DeCarbon. Armstrong management indicated that Tenneco would have to offer a 100% premium over the market price of its stock to generate its interest. Tenneco's negotiations with DeCarbon, which were conducted through an independent broker, were equally fruitless. DeCarbon had asked a selling price of 100 times its earnings. In addition, there was testimony that the French Ministry of Industry had the authority and probably the inclination to disallow such an acquisition.

Despite recognizing the failure of Tenneco's negotiations with Armstrong and De-Carbon, the Commission again retreated to speculation, asserting that continued negotiation could have produced favorable results. As we stated above, speculation does not provide an adequate basis for a finding of a section 7 violation. The Commission cannot negate the strong evidence that Armstrong and DeCarbon were not reasonably available with a bald prediction that the situation might change in the future.

As for Blackstone, the Commission itself described that company as "a small, struggling domestic firm ... burdened with aged equipment, a less than complete product line ..., declining market share and a mediocre reputation." Commission Opinion at 61, J. App. at 251. Since 1974, Blackstone had unsuccessfully sought a buyer for its business, soliciting, among others, Midas International Corp., which operates a chain of muffler installation shops, and Questor. Nevertheless, the Commission remarkably concluded that Blackstone "would have served as a viable method of toehold entry, although this route would have been more difficult and less attractive than the acquisition of a substantial foreign firm." *Id.* We do not believe that the Commission's

5. As noted earlier in this subsection, Tenneco had already acquired a very small manufacturing company, Triple S Industries, that held a patent on a new and unproven shock absorber design, the Terramatic. While the Commission viewed this acquisition as contributing to Tenneco's ability to manufacture shock absorbers, *see* Commission Opinion at 20–22, J. App. at 210 12, and as exhibiting Tenneco's interest in

the market, *see id.* at 35–38, J. App. at 225–28, it did not address the Triple S acquisition in its discussion of Tenneco's potential *de novo* or toehold entry, *see id.* at 57–67, J. App. at 247–57. Accordingly, we infer that the Commission did not consider the Terramatic patent sufficient technology to facilitate *de novo* entry or Triple S as a viable vehicle for toehold entry.

assertion that Tenneco would have acquired a weak and deteriorating firm with a poorly accepted product and run-down equipment in which neither Tenneco nor any other company had shown significant interest satisfies the requirement that a finding of a section 7 violation be based on "probabilities." *See Marine Bancorporation,* 418 U.S. at 622–23, 94 S.Ct. at 2870–2871 (quoting *Brown Shoe Co.,* 370 U.S. at 323, 82 S.Ct. at 1522).

Because we hold that the Commission's findings and conclusions with respect to Tenneco as an actual potential competitor in the market for replacement shock absorbers are unsupported by substantial record evidence, we need not reach the issue of the validity of the actual potential competition doctrine.

### III.  *Perceived Potential Competition*

We also conclude that the record contains inadequate evidence to support the Commission's conclusion that Tenneco's acquisition of Monroe violated section 7 by eliminating Tenneco as a perceived potential competitor in the market for replacement shock absorbers.

In order to make out a "perceived" potential competition case the [Commission], in addition to showing a market highly concentrated among a few firms, must prove that the acquiring company is (1) perceived by existing firms in the market as a potential independent entrant, and (2) has exercised a tempering impact on the competitive conduct of existing sellers. *Siemens Corp.,* 621 F.2d at 505 (footnote omitted). *See also Marine Bancorporation,* 418 U.S. at 624–25, 94 S.Ct. at 2871–2872. Tenneco once again challenges the Commission's findings on each of these elements, including the finding of a highly concentrated market, which we have already addressed in section B. II, *supra.*

There is abundant evidence that the oligopolists in the market for replacement shock absorbers perceived Tenneco as a potential entrant. Industry executives testified that they considered Tenneco one of very few manufacturers with both the incentive and the capability to enter the market. This perception was based on Tenneco's financial strength and on the compatibility of shock absorbers with exhaust system parts produced by Tenneco's Walker Division. This testimony was enhanced by evidence that the negotiations between Tenneco and DeCarbon were initiated by an independent broker and that the negotiations that eventually led to the Tenneco-Monroe merger were initiated by Monroe, indicating that those in the industry were aware of Tenneco's interest. This, especially when combined with the fact that industry participants were apparently not privy to the lack of success in Tenneco's toehold acquisition negotiations, is more than sufficient to satisfy the substantial evidence requirement with respect to industry perceptions of Tenneco as a potential entrant.

However, the analysis does not end here. The Commission's conclusion that the perception of Tenneco as a potential entrant actually tempered the conduct of oligopolists in the market must also be supported by substantial evidence. It is not.

Throughout this case, Tenneco has argued that in the years immediately preceding its acquisition of Monroe the market for replacement shock absorbers had become highly competitive. The Commission apparently agrees with this assessment. Commission Opinion at 13, J. App. at 203. The rate of increase in advertised retail prices for shock absorbers fell significantly behind inflation, and so-called mass merchandisers such as Sears Roebuck replaced traditional wholesale distributors as the leading purchasers of replacement shock absorbers from manufacturers. Sears retail prices for shock absorbers were frequently below the prices that manufacturers charged wholesale distributors, who were several levels above the retail customer in the traditional chain of distribution.

The advent of increased sales by mass merchandisers coincided with aggressive competition among shock absorber manufacturers. Manufacturers offered substantial discounts off their circulated price sheets to traditional wholesalers and imple-

mented "stocklifting," a practice in which a manufacturer buys a wholesaler's inventory of a competing manufacturer's product and replaces it with his own product. Perhaps the most aggressive and certainly the most successful manufacturer was Maremont, which acquired Gabriel in 1962. At the time of the acquisition, Gabriel was, in the Commission's words, "in a downward trend," *id.* at 64, J. App. at 254, and ranked third in the industry with a market share of between 10% and 20%, J. App. at 1650–51. After the acquisition, Maremont undertook an aggressive campaign to improve its position. Since that time, "Gabriel's market share has at least doubled and has possibly increased four-fold. Maremont today is the number one firm in the replacement shock absorber market." Commission Opinion at 64, J. App. at 254.

While agreeing that competitive activity increased dramatically in the mid-1970s, the Commission stated:

[W]e disagree with [Tenneco] over the cause of that new competitive vigor. In brief, we find that the source of the improved economic performance lay in industry fears that Tenneco was likely to attempt entry—an actual "edge effect"— rather than in the buyer power supposedly asserted by mass merchants against their suppliers.

Commission Opinion at 13–14, J. App. at 203–04. The Commission's hypothesis depends almost entirely on inferences drawn from the activity of Maremont. The Commission pointed to the testimony of Byron Pond, Senior Vice-President and Director of Maremont, who stated:

the attractive nature of the shock absorber business has caused us to invest because of the opportunities and also to invest because, if we didn't invest, someone else would.

. . . .

. . . One of the ways that you strengthen your position in a business and restrict or limit the amount of competition that you are faced with is to make considerable efforts to become a low-cost producer.

J. App. at 679–80. The Commission inferred from this testimony that Maremont's "efforts to 'restrict or limit' competition were in large measure aimed at deterring a destabilizing *de novo* or toehold Tenneco entry." Commission Opinion at 53, J. App. at 243. The Commission analyzed other Maremont activities as follows:

Maremont testified that it invested heavily in inventory to improve the quality of its service, its rate of "order fill," to a level substantially higher than the industry standard then in effect. The record does not reveal competitive pressure from Monroe or others within the replacement shock absorber market to improve service, but an extraordinary level of order fill could be a useful weapon against a feared potential entrant. One obvious impact is in raising the investment in inventory needed by a potential entrant to compete in winning over new accounts, making entry more expensive. Providing improved service to its accounts also can reasonably be expected to increase the loyalty of those accounts to Maremont, to increase the difficulty facing a new entrant in winning market shares generally, and to push whatever loss did arise onto Monroe or others. Finally, there is the possibility that Maremont was responding to an expectation that Tenneco, upon entering, would set a high standard of service, comparable to what it was already providing in the replacement [exhaust system parts] market.

Similarly, a better explanation for Maremont's cost-cutting and cost-absorption can be found in fear of potential entry than in the actual competition which then faced the firm. One would not expect a firm in such a concentrated market voluntarily to absorb cost increases and thereby cut its rate of return. Rather, one would expect Maremont merely to pass such increases through in the reasonable expectation that its one main competitor will find that enlightened self interest lay in following a similar course.

Even investments in cost-cutting, which generally would appear not to be inhibited by a high level of concentration,

as the payoff from that investment could be retained by the firm, here appear motivated by fear of potential entry rather than by the present competition facing Maremont. Maremont, it must be noted, had a large proportion of its sales, 41%, going to one account, Sears, Roebuck and Co., and an additional 14% going to three other mass merchants. Although the record does not disclose the nature of Maremont's contractual relationships with these other big accounts, it does demonstrate that the Sears contract provided for payment on a *cost-plus* basis, *i.e.,* projected actual cost for the contract year plus a fixed percentage of that cost as Maremont's return. This arrangement is significant for it limits the return which Maremont could obtain from investments in new, cost-saving technology. Thus, the benefit to Maremont of investment in this area is substantially less than it would otherwise seem to be.

Investment in cost-reducing technology, however, might be completely justified as an attempt to deter entry by Tenneco, or to be better prepared for more rigorous competition following entry. Indeed, Maremont recognized that Tenneco was a highly efficient [exhaust system parts] manufacturer.

In conclusion, we find that the various improvements in the competitiveness of the replacement shock absorber market in the pre-merger period cannot be adequately explained by factors indigenous to that market. Rather, the competitive upsurge appears closely related to the presence of Tenneco poised on the market's edge, in short, an actual edge effect. Commission Opinion at 54–57, J. App. at 244–47 (footnotes and citations omitted).

▉ Whatever might be our conclusion on the substantiality of this evidence standing alone to support the Commission's findings, a review of the record reveals that the Commission ignored evidence contrary to its hypothesis. We must weigh this evidence in our review of the substantiality of the record evidence. "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951).

The Commission appears to have disregarded in this portion of its analysis evidence of the precarious condition of Gabriel at the time it was acquired by Maremont. As we noted above, the Commission described Gabriel as a firm in "a downward trend" when Maremont took it over and began to implement the aggressive competitive measures which the Commission concluded were prompted by a perception of Tenneco "on the wings." We find it somewhat remarkable that, apparently aware of Maremont's shaky position in the replacement shock absorber market and its resultant need to improve that position and increase its market share, the Commission could conclude starkly: "The record does not reveal competitive pressure from Monroe or others within the replacement shock absorber market to improve [the quality of its] service...." *Id.* at 54, J. App. at 244. Equally striking is the Commission's statement that, because the industry was highly concentrated, Maremont would not voluntarily absorb cost increases and decrease its rate of return. We cannot understand how else Maremont could attract customers away from industry leader Monroe and others. The Commission's conclusion that Maremont's activity cannot be explained by a need to compete against those already in the market is clearly contrary to the record as well as common sense.

In its brief to this Court, the Commission attempts to resurrect its conclusion by noting that it need not "trace competitive conduct [in a concentrated market] 'directly and solely' ... to the perception of a firm's presence on the edge of the market." Brief for Commission at 52. Rather, the Commission argues that it need only produce enough evidence from which one might draw a reasonable inference that the competitive activities "were 'at least in part' attributable to [industry participants'] perception[s] of [a potential competitor's] presence in the wings." *Id.* at 55.

██ We have no doubt that direct evidence of an "edge effect" is not required to support a Commission finding of a section 7 violation. *See Falstaff Brewing Corp.,* 410 U.S. at 534 n.13, 93 S.Ct. at 1101 n.13. In this case, however, direct evidence concerning Tenneco's "edge effect" on Maremont *was* elicited by the Commission, though it does not support the Commission's conclusion. During the testimony of Byron Pond, Senior Vice-President and Director of Maremont, the following colloquy occurred:

Q [By Commission Counsel:] Did the presence of Walker, IPC or Midas and/or TRW as likely potential entrants into the shock absorber market, have any effect on Maremont's decisions, business decisions?

A [By Mr. Pond:] I don't think that we looked specifically at competitors on a periodic basis or potential competitors, in developing our strategy. I think we developed our strategy and approach to the business based on how we perceive it and how we perceived the opportunities. . . .

J. App. at 678–79. The Commission dismissed this testimony, arguing that the fact that Maremont did not take Tenneco directly into account was unimportant in a section 7 case "which is concerned with the probable anticompetitive impacts of acquisitions." Commission Opinion at 54, J. App. at 244.

██ The Commission's analysis of Mr. Pond's testimony confuses "direct evidence" with "evidence of a direct effect." The Commission is correct that it need not produce direct evidence that Maremont altered its actions in response to a perception of Tenneco "in the wings." However, it must produce at least circumstantial evidence that Tenneco's presence probably directly affected competitive activity in the market. *Marine Bancorporation,* 418 U.S. at 625, 94 S.Ct. at 2871 (To prove a potential competition case, the moving party must show that "the acquiring firm's premerger presence on the fringe of the target market *in fact* tempered oligopolistic behavior on the part of existing participants in that market.") (emphasis added); *Siemens Corp.,* 621 F.2d at 509 ("A claim of 'perceived' potential entry will not be upheld in the absence of evidence that present competitors have altered or tempered their conduct as a result of the acquiring firm's presence."). Moreover, when determining the substantiality of that circumstantial evidence, we must consider all other record evidence that "fairly detracts from its weight." *Universal Camera Corp.,* 340 U.S. at 488, 71 S.Ct. at 464. Mr. Pond's testimony constitutes direct evidence that Tenneco had no direct effect on Maremont's business decisions or competitive activity. In the face. of this contrary and unchallenged direct evidence, the substantiality of circumstantial evidence arguably suggesting an "edge effect" vanishes. Accordingly, we hold that the Commission's finding that Maremont's actions were probably taken in response to its desire to dissuade Tenneco from entering the market is unsupported by substantial evidence in the record. Our reading of Mr. Pond's testimony and our conclusions with respect to its effect on the substantiality of evidence underlying the Commission's findings are buttressed by the ALJ's finding that the evidence was insufficient to show an "edge effect" exerted by Tenneco. "[E]vidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the [Commission's] than when he has reached the same conclusion." *Id.* at 496, 71 S.Ct. at 468.

## CONCLUSION

For the foregoing reasons, we grant Tenneco's petition for review and set aside the Commission's order.

So ordered.

MANSFIELD, Circuit Judge (dissenting):

I respectfully dissent. In my view the Commission's findings—that Tenneco, prior to its acquisition of Monroe, was perceived as a potential competitor in the highly concentrated replacement market by the four top shock absorber manufacturers (which account for 92% of all sales) and that at

least one of them (Maremont) was thereby led to engage in additional competitive activity—are supported by substantial evidence and should be upheld. The majority, while giving lip service to the substantial evidence rule, nevertheless makes the mistake of substituting its fact-finding for that of the Commission.

The Commission, after a thorough and painstaking review of a voluminous record, made detailed findings to the effect that the replacement shock absorber business represented a separate market, that it is highly concentrated, and that a "perceived potential competition" case had been established within the requirements specified by the Supreme Court in *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 531–32, 93 S.Ct. 1096, 1099–1100, 35 L.Ed.2d 475 (1973), and *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 631, 94 S.Ct. 2856, 2874, 41 L.Ed.2d 978 (1974). See also *United States v. Siemens Corp.*, 621 F.2d 499 (2d Cir. 1980). My two colleagues agree that almost all of the Commission's findings are supported by substantial evidence. For instance they acknowledge that there is a separate replacement shock absorber market, that it is oligopolistic, with high entry barriers, and that Tenneco was perceived by existing manufacturers as a strong potential competitor. These findings are based on more than ample proof.

The shock absorber business is highly concentrated by any standards, whether one applies the Herfindahl-Hirschman Index now used by the Attorney General of the United States in the Department of Justice's latest "Guidelines" promulgated on June 30, 1982, see 47 Fed.Reg. 38,493 [sic 28,493] (1982); or the former "4-firm" test used in its pre-existing guidelines issued on May 30, 1968. The four leading manufacturers (Maremont, Monroe, Questor and General Motors) account for 92% of the sales in the replacement market. Of these the two largest (Maremont and Monroe) control 77%. In the words of the majority, "the Commission was fully justified in concluding that the replacement shock absorber market was not genuinely competitive." (Maj. Opin. p. 353).

The market is also characterized by high barriers to entry. An entrant must have a large plant (with capacity to furnish at least 10% of the market's needs) in order to operate efficiently and economically. It must have a nationwide distribution network for making prompt deliveries to wholesalers. It must advertise extensively to differentiate its product from others, and it must acquire the technology needed to design and produce competitively saleable shock absorbers.

Tenneco, a major conglomerate (ranking in 1975 as the 15th largest industrial enterprise in the United States) met all of these requirements and had a strong motive to enter. Its Walker Manufacturing Division ("Walker") is a major producer of auto exhaust system parts which it sells primarily in the replacement market. There is a strong market affinity and compatibility between the sale of exhaust system parts and the sale of replacement shock absorbers, which makes it natural, economical and logical for a manufacturer of one to engage in the other, using the same shipping, warehouse, sales and customer-installation facilities for both. Each is an "under the car product." The technologies, manufacturing processes, material components and sales organizations for the two products overlap in substantial and economically significant ways. Tenneco, as a dominant figure in the replacement exhaust system parts market, had the administrative, research and market skills needed to enter the replacement shock absorber market, as well as financial strength, a nationwide organization and facilities, plus technological skill in manufacturing hydraulic and air powered jacks, which involve many of the features of shock absorbers. Indeed, until it acquired Monroe, it was the only major manufacturer of exhaust system parts which did not fully engage in the production of shock absorbers. (Prior to the acquisition it had only bought, repackaged and sold some shock absorbers to muffler shops.) Lastly, the replacement shock absorber market, despite its ups and downs, has been consistently profitable.

None of the foregoing is disputed by the majority. Nor does it deny that the record evidence fully supports the Commission's finding that Tenneco, prior to its acquisition of Monroe, was viewed by the members of the highly concentrated oligopoly as a likely entrant. The majority concedes that "[t]here is abundant evidence that the oligopolists in the market for replacement shock absorbers perceived Tenneco as a potential entrant." (Maj. Opin. p. 355). Indeed, the evidence is overwhelming. Byron O. Pond Jr., Senior Vice President and Director of Maremont, the largest of the four manufacturers of shock absorbers, testified that his company considered Tenneco to be a likely entrant into the market, noting that "the shock absorber business has been a very profitable and lucrative business and one that would be an enticing one to be in." (App. 679). Similarly Paul Putman, Chairman of Questor, another one of the "Big Four," testified that Tenneco not only had the ability to enter the manufacture and sale of shock absorbers without acquiring Monroe but, as Questor had done, Tenneco "could have set up a facility and hired the proper technical people and the production people and marketing people ... and I think they would have gotten their share of the business, same as we did." (App. 750–51). Nor were their perceptions of entry lacking in foundation.

Existing manufacturers were fully aware that Tenneco had publicly demonstrated a strong and growing interest in entering the shock absorber market. In 1974 it had acquired Triple S, a small manufacturer of steering dampers and hydraulic steering stabilizers (both of which are akin to shock absorbers), holding patents on a new type of shock absorber, the "Terramatic," which had certain advantages over existing shock absorbers. The acquisition brought with it substantial know-how in shock absorber manufacture. It was also known to shock absorber manufacturers that over the years Tenneco had acquired a sizeable Canadian chain of muffler installation shops through which it had sold and installed shock absorbers made by others. It could reasonably be anticipated that the chain would be expanded into the United States and used as a market for Tenneco's own manufactured shock absorbers. In addition, Tenneco had negotiated seriously with Armstrong Patents, Ltd., the largest manufacturer of shock absorbers in Britain, either for purchase of shock absorbers for resale in the United States or a license to manufacture domestically. In 1976, while negotiating for acquisition of Monroe, Tenneco manifested a clear interest in acquiring the De-Carbon Shock Absorber Company, a French firm manufacturing a type of gas pressurized shock absorber considered to be superior in some respects to conventional shock absorbers. Early in 1973 Tenneco had indicated an interest in acquiring Tropic Industries, a small company with a shock absorber prototype, and dropped the matter only because of insufficient patent protection. In short, it was known throughout the market that Tenneco was eager to get into the shock absorber business.[1] Moreover, no

---

1. Tenneco attempts to minimize its efforts at entry by pointing to the disadvantages posed by each: (1) that its negotiations with Armstrong died in July 1974 when the latter indicated that it was not for sale; (2) that negotiations through a broker for DeCarbon likewise failed because it set a selling price of 100 times earnings; and (3) that although it acquired the Terramatic patent with its purchase of Triple S, it did not allocate any of the purchase price to the patent. The record and findings of the ALJ, however, reveal other evidence from which continuing interest in a new entry by toe-hold acquisition may reasonably be inferred.

The ALJ found that Tenneco, following Armstrong's 1974 refusal to sell, nevertheless believed Armstrong might react differently if it received a specific offer above the price quoted on the exchange for its stock. Moreover, Tenneco instructed its European office to maintain contact with Armstrong. The ALJ further found that Tenneco "continued to maintain its interest in Armstrong through 1976." Tenneco acquired Monroe in 1976. Similarly, with respect to DeCarbon, the ALJ found that, although "the matter of price blocked a possible acquisition from the outset," Tenneco in November 1976, during its on-going negotiations with Monroe, instructed the broker who had brought the DeCarbon prospect to Tenneco, to "stay in contact with the situation."

With respect to its "Terramatic" patent acquired from Triple S, Tenneco as late as August

other firm had its capability and interest as a potential entrant when it acquired Monroe. Indeed, it was Monroe, aware of Tenneco's interest, that approached Tenneco.

The sole remaining element of a "perceived potential competition" case is a finding that the "edge" or "wings" effect of the perceived potential entrant, Tenneco, had a pro-competitive effect on the small group which presently controlled the market. There cannot be any question about the Commission's findings, based on undisputed evidence, that during the years prior to the acquisition of Monroe, when Tenneco was stepping up its efforts to enter the market, Maremont, the largest of the existing manufacturers of replacement shock absorbers, engaged in a burst of pro-competitive conduct. It improved its ability to fill orders by investing more heavily in inventory, thus increasing availability and speed of delivery of the many types of absorbers demanded by the purchasing market. It embarked on new-product development and research, introducing a new "air-oil" absorber, and moved into the market for McPherson strut replacement cartridges. It cut and absorbed manufacturing costs, which enabled it to reduce prices.

The Commission found that this pro-competitive activity on the part of Maremont could not be adequately explained by factors indigenous to the existing replacement shock absorber market, and it inferred from all of the circumstances that Maremont's conduct was at least in substantial part a response to Tenneco's standing at the edge of the market as a competent, efficient, and financially powerful potential competitor, which would enter the market unless it were discouraged because existing competitive pressure reduced the profit prospects. The majority rejects this finding as not supported by substantial evidence. I disagree.

In considering the issue of whether the presence of a powerful potential competitor at the edge of a concentrated market controlled by a few manufacturers has a pro-competitive edge effect upon them, the Supreme Court has recognized that it would be an extraordinary case where such an effect could be proved by direct evidence. The burden is satisfied by circumstantial evidence from which the trier of fact may draw a reasonable inference of causation. See *United States v. Falstaff Brewing Corp., supra,* 410 U.S. at 534–35 n. 13, 93 S.Ct. at 1101–1102 n. 13, where the Court stated:

> "The Government did not produce direct evidence of how members of the New England market reacted to potential competition from Falstaff, but circumstantial evidence is the lifeblood of antitrust law, see *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100 [89 S.Ct. 1562, 23 L.Ed.2d 129] (1969); *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 221 [59 S.Ct. 467, 472, 83 L.Ed. 610] (1939); *Frey & Son, Inc. v. Cudahy Packing Co.,* 256 U.S. 208, 210 [41 S.Ct. 451, 65 L.Ed. 892] (1921), especially for § 7 which is concerned 'with probabilities, not certainties,' *Brown Shoe Co. v. United States,* 370 U.S., at 323 [82 S.Ct., at 1522]. As was stated in *United States v. Penn-Olin Chemical Co.,* 378 U.S. 158, 174 [84 S.Ct. 1710, 1718, 12 L.Ed.2d 775] (1964), '[p]otential competition cannot be put to a subjective test. It is not "susceptible of a ready and precise answer." '

> "Nor was there any lack of circumstantial evidence of Falstaff's on-the-fringe competitive impact. As the record shows, Falstaff was in the relevant line of commerce, was admittedly interested in entering the Northeast, and had, among other ways, see n. 8, *supra,* made its interest known by prior-acquisition discussions. Moreover, there were, as my Brother Marshall would put it, objective economic facts as to Falstaff's capability to enter the New England market; and the same facts which he would have the District Court look to in determining whether the particular theory of potential

---

12, 1976, took steps to insure that the patent rights be preserved and shortly prior to its acquisition of Monroe indicated that it planned

to use the Terramatic design in the manufacture of steering dampers and to adapt it to other types of shock absorbers.

competition we do not reach has been violated, would be probative of violation of § 7 through loss of a pro-competitive on-the-fringe influence. See *FTC v. Procter & Gamble Co., supra,* [386 U.S.] at 580–81 [87 S.Ct. at 1231–32]; *United States v. Penn-Olin Chemical Co., supra,* [378 U.S.] at 173–177 [84 S.Ct. at 1718–1720]; *United States v. El Paso Natural Gas Co.,* 376 U.S. 651, 660 [84 S.Ct. 1044, 1049, 12 L.Ed.2d 12] (1964)."

The Commission is not required, as the majority here apparently demands, to introduce "smoking gun" evidence to establish the element of causation. On the contrary, § 7 is concerned "with probabilities, not certainties," *Brown Shoe Co. v. United States,* 370 U.S. 294, 323, 82 S.Ct. 1502, 1522, 8 L.Ed.2d 510 (1962). It is sufficient, therefore, to show a *"probability* that the acquiring firm prompted premerger pro-competitive effects within the target market by being perceived by the existing firms in that market as likely to enter," not a certainty. *United States v. Marine Bancorporation, Inc., supra,* 418 U.S. at 625, 94 S.Ct. at 2871 (emphasis added). Section 7 bars an acquisition where "the effect . . . *may* be substantially to lessen competition . . ." (emphasis added). Nor is it necessary to show that *all* pro-competitive activities in the market be attributed to the potential competitor's presence at the edge as long as some substantial lessening of competition is shown, even though partial. *Id.*

In determining whether the Commission's findings are supported by substantial evidence we may not substitute our inferences for those drawn by the Commission, provided its findings are rationally based. *Fruehauf Corp. v. FTC,* 603 F.2d 345, 351 (2d Cir. 1979). Nor may we reject the Commission's findings merely because there is an equally plausible inference or because we have doubts about the reasonableness of the inference and consider another to be equally or even more reasonable. See *NLRB v. Crystal Springs Shirt Corp.,* 637 F.2d 399, 402 (5th Cir. 1981). In short we are not the fact finders.

In the present case the majority in my view has violated these principles in rejecting the Commission's finding of pro-competitive edge effect. The majority, without any foundation in the record or elsewhere, concludes that the Commission "*ignored* evidence contrary to its hypothesis," and that "[w]e must *weigh* this evidence in our review of the substantiality of the record evidence," *supra,* p. 357 (emphasis added). The first statement flies in the face of the record and the second violates the well-established rule that we do not "weigh" the evidence. We merely determine whether there was substantial evidence in support of the Commission's findings.

The majority first faults the Commission's statement that the record does not reveal competitive pressure by Monroe or by the other existing manufacturers on Maremont that would cause it to engage in its competitive campaign prior to Tenneco's entry. The Commission's statement, however, is clearly correct. There was no evidence of financial weakness on the part of Maremont when it engaged in active pro-competitive activities during the years immediately prior to the Tenneco-Monroe merger. Although Gabriel had been in a weak condition when it was acquired by Maremont in 1962, the business had long since been strengthened and was thriving now that Maremont had become the largest producer of replacement shock absorbers, accounting for more than 46.1% of replacement sales in 1976. If Maremont ever had a "shaky position in the replacement shock absorber market," as the majority suggests, it was a decade earlier. In short, Maremont had made its heavy investment in Gabriel and through competition had captured the lion's share of the market so that it was no longer required to engage in competitive activity, as it had years earlier, to maintain its No. 1 position as against the three other leading shock absorber manufacturers.

The majority next concludes that the Commission erred in stating that Maremont would not have voluntarily cut its prices and profits in a concentrated market. The majority attributes this activity, without any evidentiary basis, to Maremont's need

to compete against Monroe and others rather than to its desire to forestall Tenneco's entry. Economic experience in an oligopolistic market is to the contrary. When, as here, four leading manufacturers possess what amounts to a collective monopoly in a business with high entry barriers, controlling 92% of the market sales, it is usually self-defeating for one to cut prices and profits, since the effect more often than not is to force the other three to do the same, leaving the market shares the same but profits reduced for all. 2 P. Areeda & D. Turner, *Antitrust Law* § 404b, at 273–74 (1978). This is what § 7 is all about.

"Nevertheless there is general agreement, ... that an undue reduction in the number of competing sellers, or undue concentration of sales in the hands of a few relatively large sellers, is likely to lead to non-competitive pricing, either through recognized interdependence or actual collusion or both. Acceptance of that proposition brings one to the second key problem: neither economic theory nor empirical evidence specifies the minimum number of sellers normally necessary for effective price competition or the level of concentration among leading firms normally impeding it. However, there is a substantial consensus that independent pricing among sellers of a homogeneous product is likely to occur in a market with as few as 10 to 12 equivalent sellers or, unless the total number of firms is very small, with a four-firm concentration ratio below 55 or 60 percent. *When that ratio exceeds 75 or 80 percent, the danger of non-competitive pricing is likely to be very high.*" 4 P. Areeda & D. Turner, *supra,* § 908, at 27 (emphasis added).

Indeed, the majority's earlier finding (p. 11) that the market "was not genuinely competitive" is inconsistent with its later finding that Maremont's activity can "be explained by a need to compete against those already in the market," specifically citing Monroe. (Maj. Opin. p. 357).

The majority next asserts that the Commission erred in rejecting the following testimony of Byron O. Pond, Jr., Senior Vice-President and Director of Maremont:

"Q Did the presence of Walker, IPC or Midas and/or TRW as likely potential entrants into the shock absorber market, have any effect on Maremont's decisions, business decisions?

"A I don't think that we looked specifically at competitors on a periodic basis or potential competitors, in developing our strategy. I think we developed our strategy and approach to the business based on how we perceive it and how we perceived the opportunities ...." (Maj. Opin. p. 358).

Pond's testimony is described by the majority as "direct evidence that Tenneco had no direct effect on Maremont's business decisions or competitive activity." *Id.* at 358. If this testimony stood alone it might support the majority's characterization, subject to its being discounted heavily by the Commission (as is its right) as the statement of an obviously biased member of the "Big Four," which had a great deal to gain by preventing a divestiture of Monroe that would put Tenneco back on the edge of the market, determined to enter as a new, fifth competitor rather than simply to succeed by acquisition to Monroe's share as one of the existing four.

The inference drawn by the majority from Pond's testimony, however, is destroyed by the balance of his answer:

"A ... We have long felt that the shock absorber business has been a very profitable and lucrative business and one that would be an enticing one to be in.

.     .     .     .     .

"And our feeling has been that this has made the shock absorber business an attractive one. Our—the attractive nature of the shock absorber business has caused us to invest because of the opportunities *and also to invest because, if we didn't invest, someone else would.*

.     .     .     .     .

"We maintain service levels higher than most other people do in the industry. Where very often the norm is 90 to 92 percent availability, we have invested

considerably more in inventory to provide service levels in the 98 and 99 percent range. We have made significant investments in research and development in bringing new products to the market, not only to help increase our share of the business, *but to make that a less exciting or less desirable business for competitors to expand in.*

.    .    .    .    .

"Q Did this potential have any effect on Maremont's costs or prices?

"A Well, it certainly had an impact on our cost. *One of the ways that you strengthen your position in a business and restrict or limit the amount of competition that you are faced with is to make considerable efforts to become a low-cost producer.* We have had as a company very aggressive cost-reduction programs over the past eight or nine years, but more specifically, over the past three to four years, to reduce the cost of our product, to reduce the cost of our every-day market products." (App. at 678–81) (emphasis added).

In my view it was not unreasonable for the Commission to interpret Pond's testimony, when viewed against all of the surrounding circumstances, as an admission implying that Tenneco was the "someone else" who would invest if Maremont did not and that Maremont had pursued its "efforts to become a low-cost producer" in order to "restrict or limit the [potential] competition that [it] . . . faced" from Tenneco. One would hardly expect Maremont, the largest manufacturer in a highly concentrated business—one of four controlling 92% of the market—to describe Tenneco by name as the reason for its own increased competitive efforts. An astute witness such as Pond, a top Maremont official, would recognize that in an antitrust suit based on lessening of perceived potential competition, testimony along such lines would increase the chances that Tenneco would be ordered to divest itself of Monroe, and that this in turn might result in Tenneco's later entering the market *de novo* or by toe-hold acquisition, increasing the competition heavily as compared with the *status quo* which would continue if Tenneco were to remain simply as a successor to Monroe, the second largest manufacturer, accounting for 32.4% of replacement sales in 1976.

Regardless whether one agrees that Pond's testimony supports the Commission's finding, the interpretation most favorable to Tenneco would be that Pond's testimony, standing alone, is ambiguous, *not* that it negates any "edge effect" caused by Tenneco's potential entry. Not even the Administrative Law Judge went as far as the majority does here. He simply stated that the testimony was "unclear" because it "can be read to refer to potential competitors, or it can be read to refer to competitors presently in the market, or to both." Thus the majority errs in suggesting that the Commission's finding is contrary to credibility findings made by an administrative law judge "who has observed the witnesses," citing *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (holding that while the Board must consider an ALJ's findings it may reverse an ALJ even though his findings are not "clearly erroneous"). The ALJ's recommended decision here was not based on an appraisal of Mr. Pond's credibility but on his unwillingness to choose one of three plausible interpretations of Pond's testimony, each of which he recognized as reasonable. As the Supreme Court made clear in *Universal Camera Corp., supra,* the Commission, as the ultimate fact finder, was entitled, as long as it gave due consideration to the ALJ's findings, which it certainly did here, to choose one of these interpretations rather than reject the testimony entirely as "unclear." When one considers Pond's testimony against the strong and undisputed proof that Tenneco was viewed by Maremont and others in the concentrated market as a powerful potential competitor, the Commission's finding of edge effect is both rational and supported by substantial evidence.

For these reasons I dissent.