**ALBERTA GAS CHEMICALS LIMITED and Alberta Gas Chemicals, Incorporated, Appellants,**

v.

**E.I. DU PONT DE NEMOURS AND COMPANY, Du Pont Holdings, Inc., and Conoco Inc.**

No. 86–5662.

United States Court of Appeals, Third Circuit.

Argued Feb. 25, 1987.

Decided Aug. 17, 1987.

Rehearing and Rehearing In Banc Denied Sept. 10, 1987.

---

James M. Brachman (argued), Richard E. Grimm, Freeman, Wasserman & Schneider, New York City, for appellants.

Henry P. Sailer (argued), Carolyn F. Corwin, Covington & Burling, Washington, D.C., for appellees.

Before WEIS, BECKER and HUNTER, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

In this antitrust suit a methanol producer challenges a competitor's acquisition of another corporation. The merger led to cancellation of the acquired company's plans to produce methanol by a new process, preceded by large scale purchases to stimulate the market before beginning production. We conclude that the plaintiffs' alleged loss of anticipated sales resulting from that expected increase of market activity does not constitute antitrust injury. We determine further that the plaintiffs' collateral loss of sales to the acquired company in the circumstances amounts to only a de minimis foreclosure, and does not constitute antitrust injury. Consequently, we will affirm the district court's entry of summary judgment in favor of defendant.

In 1981, E.I. Du Pont de Nemours and Company acquired Conoco Inc., in a transaction of approximately 7.8 billion dollars. Plaintiffs contend that the merger violated § 7 of the Clayton Act, 15 U.S.C. § 18, because it "may substantially lessen competition" in the United States market for methanol. Plaintiffs seek an order for divestiture as well as money damages of 98.5 million Canadian dollars for lost profits and interest and 153 million Canadian dollars for reduced value of the plaintiffs' business.

Although Du Pont and Conoco produce a variety of products, this litigation focuses on the methanol-producing and methanol-consuming aspects of their operations. Methanol is a chemical used in the manufacture of such products as formaldehyde, plywood, particle board, various plastics, and many others. Methanol can also be used as a fuel both in its pure form and as an additive to gasoline. It is viewed as a successor to gasoline in motor vehicles, to natural gas and petroleum in utility generators, and to petroleum in various chemical uses.

Plaintiffs are Alberta Gas Chemicals, Ltd., a Canadian natural gas producer, and its New Jersey subsidiary, Alberta Gas Chemicals, Inc. (collectively "Alberta"). Alberta produces methanol from its natural gas holdings in Canada and boasts the largest source of the product in that country. In the highly concentrated United States "merchant market," that is, the market for methanol not used by the producing company for internal manufacturing, Alberta's sales accounted for about 7% in 1981.

Defendant Du Pont was the largest producer of methanol in the United States in 1981, recording sales of about 30% of the merchant market. In that year, Du Pont devoted about half of its production to internal operations. Du Pont and the second largest producer together controlled about 50% of the market, and the four largest companies accounted for more than 70%.

At the time of the acquisition, Conoco was an international energy company owning the largest coal reserves in the United States. It did not produce methanol, but in 1980 purchased roughly nine million gallons for use in its chemical and plastic manufacturing plants in New Jersey and Louisiana. Its purchases represented approximately 1.8% of total merchant market sales in the United States.

Although methanol is generally manufactured from natural gas, studies have demonstrated the potential for using coal as a source through a gasification and liquefaction process. During the 1970s and early 1980s when crude oil prices rose rapidly, projects that experimented with coal to produce synthetic fuels grew commercially attractive. With governmental encouragement, many corporations explored coal gasification and, by mid–1981, at least sixteen coal-to-methanol projects were active.

Before the merger, Conoco had been studying plans to construct a large coal gasification facility in the United States. Among other uses, the company considered blending methanol with gasoline to produce gasohol, a fuel for motor vehicles that Conoco would market through its existing service stations, particularly on the west coast.

After the merger, Conoco cancelled the coal gasification project. The company also sold its chemical plant in Louisiana and dismantled the one in New Jersey. By 1984, Conoco's methanol purchases were comparatively minimal.

Because of the lead time necessary for construction, Conoco's first methanol plant was not likely to have begun operations until the late 1980s. In order to have a market in place when manufacture began, Alberta asserts that Conoco planned to purchase large quantities of methanol from a number of producers in the interim. Conoco would then sell this methanol on the merchant market to stimulate additional demand.

Alberta estimates that Conoco would have purchased at least one hundred million gallons of methanol per year in the interim before its own production facilities became operational. Alberta would have supplied some of this quantity, it says, and to that extent would benefit directly. It would profit indirectly through the increased price for methanol brought about by the large demand created by Conoco's purchases. These elements make up Alberta's first or "demand creation" claim.

Alberta's second claim is based on the premise that it would have sold methanol to Conoco for its chemical and plastic plants in New Jersey and Louisiana. After the merger, Conoco filled some of its needs through Du Pont and other companies, but none through Alberta. Alberta claims damages for a loss of sales to Conoco which, it is alleged, resulted from the merger.

After the acquisition, Du Pont temporarily closed one of its two methanol-producing plants and, although it no longer predominates in the "merchant market," still possesses substantial market power. The price of methanol has declined substantially since the early 1980s, and there is now an oversupply in the world market. Du Pont insists that Conoco did not proceed with coal gasification plans because of the falling price of oil and observes that other companies also abandoned their projects for the same reason.

Conoco's consumption of methanol fell after the merger to about 400,000 gallons in 1985, none of which Du Pont supplied. Conoco had purchased some methanol from Alberta in the late 1970s, but was not a customer of plaintiffs at the time of Du Pont's acquisition.

Alberta filed suit on September 25, 1981, in the United States District Court for the District of New Jersey. The complaint asked for equitable relief, but Alberta did

not seek a preliminary injunction. The merger became effective on September 30, 1981. After the parties had conducted extensive discovery, the district court granted summary judgment in favor of Du Pont on Alberta's horizontal or "demand creation" claim and, at a later date, on the "vertical" count as well.

The court assumed for purposes of summary judgment that Du Pont's acquisition of Conoco violated § 7 of the Clayton Act[1] and that Alberta had suffered the losses it claimed. In addition, the court also accepted Alberta's theory that potential competition between Du Pont and Conoco had been or would be eliminated because of cancellation of the coal gasification project. Rejecting Alberta's arguments, the district court stated that the absence of a projected increase in industry demand was not identical to a lessening of competition. There being no antitrust injury in the view of the court, it denied Alberta's demand creation claim.

The district court distinguished Alberta's second or "vertical" claim—that for losses of sales to Conoco's chemical plants. Relying on *Brown Shoe Co. v. United States,* 370 U.S. 294, 328, 82 S.Ct. 1502, 1525, 8 L.Ed.2d 510 (1962), the court reasoned that foreclosing competitors from a segment of the market would make defendant liable for losses traceable to that action. Because Conoco had ceased its chemical manufacturing operations by 1984, however, the court ruled that Alberta could not establish any losses after that point.

In addition, the court observed that Alberta had not submitted any breakdown of the losses suffered between the acquisition in 1981 and Conoco's withdrawal from the plastic and chemical manufacturing fields in 1984. Based on this gap in proof, the court concluded that Alberta had failed to meet its burden on damages. Moreover, the court stated that its decision was compelled because "even before the merger

Conoco had no plans to purchase methanol from Alberta."

Finally, the court denied Alberta's claim for an injunction. The court noted that because the antitrust injury requirement applies to claims for equitable relief, Alberta's failure to demonstrate antitrust injury in its damage claims was fatal to its prayer for divestiture.

On appeal, Alberta contends that it would prove its vertical claim at trial by showing prospects of sales to Conoco and argues that summary judgment was inappropriate to resolve this issue of material fact. Alberta asserts, in addition, that the district court erred in evaluating the vertical claim by relying on Du Pont's post-acquisition activity. That conduct, Alberta says, is self-serving and is merely temporary forbearance limited to the duration of the current litigation.

As to the demand creation claim, Alberta argues that in failing to find antitrust injury, the district court erred because it did not recognize that the damages flow directly from "either ... the [antitrust] violation or ... anticompetitive [acts] made possible by the violation." Brief for appellants at 27 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)).

### I.

Summary judgment can be granted only if no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). An issue is "genuine" only if the evidence is such that a reasonable jury could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and de-

---

1. Section 7 provides in pertinent part:

   No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital ... of another person engaged also in commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

   15 U.S.C. § 18.

termine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 2511. On review of a grant of summary judgment, this court applies the same test that the district court should have adopted. *Marek v. Marpan Two, Inc.,* 817 F.2d 242 (3d Cir.1987).

## II.

It is important to place this litigation in its proper setting. The district court assumed, *arguendo,* that § 7 had been violated. If the government were prosecuting, sanctions against defendant should follow. Otherwise, public policy against improper mergers as expressed in the antitrust laws would not be realized.[2]

This is not, however, a suit instituted by the government for the benefit of society as a whole, but a claim brought by a private litigant—a competitor of defendant. To supplement enforcement of the antitrust laws, Congress has created private causes of action to recover treble damages and obtain equitable relief. *See* 15 U.S.C. §§ 15, 26. This additional avenue of enforcement, however, is not open to all who might be interested in punishing the wrongdoer or who might have suffered some peripheral loss. In an effort to keep private enforcement within reasonable bounds, the courts have imposed limitations designed to discourage plaintiffs other than those most apt to carry out the purposes of the statutes.

Courts have carefully scrutinized enforcement efforts by competitors because their interests are not necessarily congruent with the consumer's stake in competition. Mergers that promote efficiency and lower prices in the marketplace, for example, may cause economic loss to competitors.

Conduct that harms competitors may benefit consumers—a result the antitrust laws were not intended to penalize. "When the plaintiff is a poor champion of consumers, a court must be especially careful not to grant relief that may undercut the proper functions of antitrust." *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.,* 784 F.2d 1325, 1334 (7th Cir. 1986); *see Cargill, Inc. v. Monfort of Colo., Inc.,* —— U.S. ——, 107 S.Ct. 484, 493, 93 L.Ed.2d 427 (1986) (competitor's loss of profits due to increased price competition following a merger does not constitute a threat of antitrust injury)[3]; *see also* Hovenkamp, *Merger Actions for Damages,* 35 Hastings L.Rev. 937, 956 (1984) (private plaintiffs' injuries are as likely to be caused by the efficiency aspects of mergers as by their market power effects); Baumol & Ordover, *Use Of Antitrust To Subvert Competition,* 28 J.L. & Econ. 247 (1985).

One restriction on private enforcement the courts have imposed is the doctrine of standing. A malleable concept not easily defined, antitrust standing has been construed in a variety of ways and settings. The struggle to articulate a precise formulation is a continuing one because success has proved elusive.

At times, the label "standing" has caused confusion when used in the antitrust context as opposed to the constitutional sense. The Supreme Court has noted that "[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters,* 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907, 74 L.Ed.2d 723 (1983).

**2.** The Justice Department did examine the merger and, with the exception of a joint venture in an area not pertaining to methanol, did approve the acquisition of Conoco on July 30, 1981. The joint venture objection was resolved by a complaint and stipulated final judgment filed in the United States District Court for the District of Columbia on August 4, 1981, Docket No. 81–1837.

**3.** For collections of cases and commentary, *see* Note, *Horizontal Mergers, Competitors, and Antitrust Standing Under Section 16 of the Clayton Act: Fruitless Searches for Antitrust Injury,* 70 Minn.L.Rev. 931 (1986); Note, *Standing to Sue for Clayton Act Injunctions: Chrysler—Injured Party or Disgruntled Competitor?,* 31 Wayne L.Rev. 1275, 1283 (1985).

As the Court said, it is not enough that the complaint alleges "a causal connection between an antitrust violation and harm to the [plaintiff].... [T]he mere fact that the claim is literally encompassed by the Clayton Act does not end the inquiry." *Id.* at 537, 103 S.Ct. at 908. Among the factors that must be weighed in determining antitrust standing are the directness or indirectness of the injury, the court's ability to keep trial of the claim within the judicially manageable limits, and the nature of the injury (*i.e.*, is it of the type that the antitrust laws were meant to prevent). *Id.* at 538–45, 103 S.Ct. at 908–12. *See Merican, Inc. v. Caterpillar Tractor Co.*, 713 F.2d 958, 964–65 (3d Cir.), *cert. denied*, 465 U.S. 1024, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1983). *See also Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745, 97 S.Ct. 2061, 2074, 52 L.Ed.2d 707 (1977); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 264, 92 S.Ct. 885, 892, 31 L.Ed.2d 184 (1972).

The "nature of the injury" factor determines whether the plaintiff has suffered "antitrust injury." This term was the focus of discussion in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701. There, the Court stated that to recover treble damages for a § 7 violation, plaintiffs must prove more than harm causally linked to an illegal presence in the market. Rather, they must establish antitrust injury—"injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* at 489, 97 S.Ct. at 697. The harm "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations ... would be likely to cause.'" *Id.* (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969)); *see also Blue Shield of Va. v. McCready*, 457 U.S. 465, 482–83, 102 S.Ct. 2540, 2550, 73 L.Ed.2d 149 (1982); *Associated Gen. Contractors*, 459 U.S. at 538–40, 103 S.Ct. at 908–09.

Expanding on that notion, in *Cargill*, the Court held that a private plaintiff seeking an injunction under § 16 of the Clayton Act, 15 U.S.C. § 26, must show a threat of antitrust injury. *See also Pennsylvania Dental Ass'n v. Medical Serv. Ass'n of Pa.*, 815 F.2d 270, 275 (3d Cir.1987); *Schoenkopf v. Brown & Williamson Tobacco Corp.*, 637 F.2d 205, 210–11 (3d Cir. 1980).

A showing of antitrust injury is necessary but not always sufficient to establish antitrust standing. A party may have suffered antitrust injury yet not be considered a proper plaintiff for other reasons. *See Cargill*, 107 S.Ct. at 489–90 & nn. 5, 6. It has been suggested that although standing is closely related to antitrust injury, the two concepts are distinct. Once antitrust injury has been demonstrated by a causal relationship between the harm and the challenged aspect of the alleged violation, standing analysis is employed to search for the most effective plaintiff from among those who have suffered loss. *See Cargill*, 107 S.Ct. at 490 n. 6; *Schoenkopf*, 637 F.2d at 210; *see also* Page, *The Scope of Liability for Antitrust Violations*, 37 Stan.L.Rev. 1445, 1484 (1985). However, in the sense that plaintiffs who sustain no antitrust injury may not recover, they may be loosely said to lack standing. Some courts and commentators thus have treated *Brunswick* as a standing case, although its concerns actually centered on antitrust injury.

*Cargill* emphasized the necessity for scrutinizing the antitrust injury factor. There, the Court wrote that the antitrust laws protect business against "the loss of profits from practices forbidden by the antitrust laws.... [C]ompetition for increased market share[ ] is not activity forbidden by the antitrust laws." 107 S.Ct. at 492. In short, Clayton Act deterrence through compensatory provisions is aimed toward the directly harmful effects of an antitrust transgression. The statutory sanctions do not constitute a broad restitutionary scheme for injuries not closely related to the violation but caused by other effects, desirable or not, of the illegal conduct. *Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367, 372 (3d Cir.1985); *Sit-*

*kin Smelting & Refining Co. v. FMC Corp.*, 575 F.2d 440, 447–48 (3d Cir.), *cert. denied*, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978). Mindful that antitrust law aims to protect competition, not competitors, we must analyze the antitrust injury question from the viewpoint of the consumer. *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962).

The issue before us is whether Alberta has asserted losses which may properly be called antitrust injury. Concerns about "standing" in this case must be read in that light.

### III.

As noted above, Alberta's first, or horizontal, claim seeks damages for lost sales allegedly caused by the termination of Conoco's plans to produce and build demand for methanol as a fuel. The acquisition, resulting in cancellation of the coal gasification project, according to Alberta, violated § 7 because Du Pont eliminated Conoco as a substantial methanol producing competitor. That action also ended Conoco's plans to spur demand for methanol as fuel. As a result, Alberta asserts that it lost sales and profits when "competition for the sale of hundreds of millions of gallons of additional methanol [to Conoco to build interim demand] was eliminated." Brief for appellants at 28.

The district court found that injury from this "demand creation" claim "bears absolutely no relationship to the aspect of the merger which is said to make it illegal under § 7, that is, that it lessens competition in the methanol industry." The court noted that "Alberta Gas alleges no damages as a result of the elimination of poten-

tial competition between Du Pont and Conoco. Instead, the damages alleged are purely the result of the failure of demand to rise.... No damages can possibly be awarded Alberta Gas on this theory."

Alberta contends that, in reaching this conclusion, the district court misapplied *Brunswick*. We do not agree.

For purposes of this discussion, we will assume, as did the district court, that the acquisition is illegal because it enabled Du Pont to bar Conoco from entering the methanol-producing industry as an independent competitor.[4] In this setting, the concern of the antitrust laws and consumers is the loss of competition between Du Pont and Conoco after the latter's entry into the market as a producer. *See Brown Shoe*, 370 U.S. at 335, 82 S.Ct. at 1529 (validity of horizontal merger depends on certain factors, including whether it will absorb or insulate competitors, thereby lessening competition between the acquiring and acquired companies).

But Alberta's horizontal injuries do not flow "from that which makes the defendants' acts unlawful." *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697. Alberta's alleged losses were neither connected with, nor resulted from, Du Pont's market power in the methanol-producing industry. That is clear because the same harm would have occurred had any acquirer decided to curtail Conoco's production and marketing plans. For example, a non-methanol producing company, whose merger would not pose antitrust problems, might have been dissuaded from entering the market because of the costs of coal gasification or the depressed prices of oil and natural gas, the more traditional energy sources. That

---

**4.** Our fundamental difference with the dissent is its focus on the illegality and anti-competitiveness of the merger. The comments on intent, for example, are pertinent only to the issue of legality. But the district court assumed the merger violated § 7, as do we on this appeal. Thus, further discussion about the merits, or lack of them, of the merger are not really relevant.

It seems also that the dissent is concerned with the long-range effects of the merger; however, most of Alberta's claimed injuries flow from the absence of the temporary, interim period of market stimulation. Plaintiffs do not, and could not, complain about the ultimate effect of the merger—the prevention of a competitor's entry into the market.

In short, as we see it, the question presented here is not whether the merger is socially undesirable, but whether these plaintiffs should be allowed to collect damages. That is quite a different question than whether the merger should be permitted.

Du Pont might have had an additional reason—a desire not to increase its total production of methanol—does not change the nature of the effect of Du Pont's decision on Alberta. Alberta, as a competitor, is in no position to claim compensable injury from Du Pont's elimination of a potential increase in output. *See Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1354, 89 L.Ed.2d 538 (1986) (competitors cannot recover antitrust damages for a conspiracy to impose non-price restraints that have the effect of either raising market price or limiting output); Page, *supra*, 37 Stan.L.Rev. at 1471 (competitors suffer no antitrust injury from horizontal merger resulting in higher prices).

■ Further, Conoco's status as a potential competitor in the methanol merchant market is irrelevant to Alberta's theory of injury. Alberta's alleged injuries flow not from the elimination of Conoco as a potential competitor, but from the loss of Conoco as a future *consumer* of methanol.[5] While in this case there may be some connection between Conoco's plan to become a competitor and its plan to consume more methanol in the future, the former plan is really only coincidental to the harm which Alberta supposedly sustained. In a challenge to a horizontal merger, a private plaintiff must show that it was injured because the acquiring and the acquired firms are competitors in a field of commerce. It is not enough to demonstrate that, by happenstance, the merging firms are competitors or potential competitors.

In *Brunswick*, bowling centers in three distinct markets contended that the wealthy defendant's acquisition of some of their competitors violated § 7. The Court found no antitrust injury because plaintiffs "would have suffered the identical 'loss'— but no compensable injury—had the acquired centers instead obtained refinancing or been purchased by 'shallow pocket' par-

ents." 429 U.S. at 487, 97 S.Ct. at 697. Similarly, because Alberta's injuries would have occurred absent a violation of § 7, they do not flow from the anticompetitive effects of the merger.

Moreover, the Du Pont-Conoco merger would not necessarily lead to the loss of profits Alberta claims. Consistent with a finding that the acquisition violated § 7, Du Pont could have chosen to go forward with a coal-based strategy, providing Alberta with its anticipated sales and profits. In *Brunswick*, the Court noted that if Brunswick "acquired thriving bowling centers—acquisitions at least as violative of § 7 as the instant acquisitions—respondents would not have lost any income that they otherwise would have received." *Id.* at 487 n. 12, 97 S.Ct. at 697 n. 12.

Similarly, if in the future Du Pont proceeds with coal gasification procedures, a development Alberta maintains will occur, the same market effects may well result. Because Alberta's injuries were not proximately caused by the anticompetitive effects of the Du Pont-Conoco merger, they do not flow from the alleged § 7 violation. *See Associated Gen. Contractors*, 459 U.S. at 535–36, 103 S.Ct. at 907; *Gregory Marketing Corp. v. Wakefern Food Corp.*, 787 F.2d 92, 94, 96 (3d Cir.) (broker's injuries from reduced commissions not proximately caused by the anticompetitive nature of a pricing agreement because the broker's profits "would not necessarily be reduced by diminished competition"), *cert. denied*, —— U.S. ——, 107 S.Ct. 87, 93 L.Ed.2d 40 (1986).

Finally, Alberta's horizontal losses are not injury of the type the antitrust laws were intended to prevent. The *Brunswick* plaintiffs complained that in acquiring each failing bowling center, defendant deprived them of the profits plaintiffs would have realized from increased market concentration when the center went bankrupt. The

---

5. Thus, Alberta's alleged damages more closely resemble injuries flowing from a "vertical foreclosure" than injuries one would expect to follow from a horizontal merger. We believe, however, that in order for Alberta to maintain an action based on a vertical foreclosure theory, it would, at a minimum, have to demonstrate that a portion of the existing market has actually been foreclosed by the merger. Alberta, of course, cannot make such a showing in connection with its "demand creation" theory.

Court concluded that "it is far from clear that the loss of windfall profits that would have accrued had the acquired centers failed even constitutes 'injury' within the meaning of § 4. And it is quite clear that if respondents were injured, it was not 'by reason of anything forbidden in the antitrust laws.'" 429 U.S. at 488, 97 S.Ct. at 697.

In this case, Alberta seeks damages from Du Pont's abandonment of Conoco's strategy to increase demand and price for methanol. As in *Brunswick,* Alberta contends, not that its position worsened as a result of the acquisition, but rather that it was denied sales and profits from an increase in demand—essentially windfall profits. The antitrust laws, however, do not award damages or equitable relief for losses stemming from the failure of a competitor to bring about an increase in demand and price. *Matsushita,* 106 S.Ct. at 1354; *see also* Areeda, *Antitrust Violations Without Damage Recoveries,* 89 Harv.L.Rev. 1127, 1134 (1976) (In *Brunswick,* "the plaintiff never established that its position had worsened—it argued only that without the merger it would have been better off due to the failure of its competitors. It would be stretching beyond credibility the words 'injur[y] in business or property' to include within their terms this kind of disappointed expectation of windfall profit.").

The district court accurately described Alberta's claim as one not for a reduction of its existing sales base but the denial of an increase. Significantly, cancellation of the gasification project did not cause any decrease in the supply of methanol in the marketplace; consequently, the merger did not diminish the amount available to consumers. Alberta's position can be sustained only if the antitrust laws impose an affirmative duty on a producer to expand markets in addition to the prohibitions against undertaking anticompetitive measures to reduce them. Alberta cites no authority for such a construction of the antitrust laws.

From the consumer's standpoint, the development that Alberta anticipated and the basis for its claim—an increase in methanol price—would prove distinctly disadvantageous. It is unavailing to argue that Du Pont's failure to bring about an increase in the price of methanol injured Alberta in a manner that the antitrust laws were intended to compensate. *See Cargill,* 107 S.Ct. at 492 (antitrust laws intended to protect price competition); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.,* 729 F.2d 1050 (6th Cir.), ("[i]t is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition"), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 510, 83 L.Ed.2d 401 (1984).

We are struck, moreover, with the fact that the presence of Conoco as a competitor in the marketplace would not serve Alberta's self-interest in the long run. It is curious that Alberta would assert a loss by conduct of Du Pont which, if Alberta is to be credited, reduced the number of suppliers in the marketplace. If that action helps Du Pont as a producer, it inevitably aids Alberta as well as every other producer.[6] *See generally* P. Areeda & D. Turner, *Antitrust Law* ¶ 335.2f, at 239 (1986 Supp.) (joint venture creating disincentive for a foreign producer to commence independent manufacturing operations in the United States would result in reduced competition, which would only benefit a competitor in the American market).

In sum, because Alberta has not asserted antitrust injury from the horizontal aspects of the merger, the district court did not err in granting summary judgment for Du Pont on those claims.

### IV.

In analyzing Alberta's vertical injuries, that is, loss of methanol sales to Conoco for its plastic and chemical plants, the district court said that "there is no possibility that Alberta Gas will be able to show damages from any lost sales due to the merger." The court found that by July 1984, Du Pont

---

**6.** Alberta says that it "has an inherent competitive advantage over other methanol producers in the United States since it has access to large quantities of inexpensive natural gas, currently the raw material for producing methanol." Brief for appellants at 35.

had divested or shut down Conoco's methanol-consuming operations. The district court also determined that Conoco had no plans before the merger to purchase Alberta's methanol from 1981 to 1984. Therefore, the court concluded that Alberta failed to establish a basis for damages.

Alberta now contends that, with respect to the vertical claim, it can prove at trial it would have sold methanol to Conoco and, therefore, the district court erred in making factual determinations which are subject to substantial dispute. We need not resolve this point because we will affirm on another ground. *See Fairview Township v. EPA*, 773 F.2d 517, 525 n. 15 (3d Cir. 1985) (this court may affirm the district court on any basis finding support in the record).

In essence, Alberta seeks compensation for lost sales resulting from Du Pont-Conoco self-dealing after the merger. The district court noted that in 1980, the year before the merger, Conoco purchased 8.9 million gallons of methanol representing approximately 1.8% of total merchant methanol market sales. Alberta claims injury because Du Pont, and not Alberta, supplied the post-merger methanol requirements for Conoco's New Jersey and Louisiana plants.

In *United States v. General Dynamics Corp.*, 415 U.S. 486, 504, 94 S.Ct. 1186, 1197, 39 L.Ed.2d 530 (1974), the Court commented that the probative value of "postacquisition evidence tending to diminish the probability or impact of anticompetitive effects" in a § 7 case is "extremely limited." The need for such a limitation is obvious. "If a demonstration that no anticompetitive effects had occurred at the time of trial or of judgment constituted a permissible defense to a § 7 divestiture suit, violators could stave off such actions merely by refraining from aggressive or anticompetitive behavior when such a suit was threatened or pending." *Id.* at 504–05, 94 S.Ct. at 1197.

The Court's remarks are pertinent to our present antitrust injury inquiry. To avoid the questionable validity of some postacquisition evidence tending to minimize the future anticompetitive effects of the Du Pont-Conoco merger, we generally will view the acquisition at the time of its occurrence and accept the facts as Alberta asserts them.

Early in the litigation, the district court denied Du Pont's motion to dismiss based on allegations that Du Pont-Conoco self-dealing following the merger foreclosed 3% of the market. As discovery progressed, it became apparent that Conoco's purchases for its chemical plants equalled substantially less than 3% of the merchant market. Although recognizing that foreclosure per se did not constitute a violation of § 7, the court never reexamined the extent to which the market had been affected by the merger, but instead chose to grant judgment on Alberta's failure to prove fact of injury.

■ Clearly, de minimis foreclosure of a market is not an antitrust dereliction in itself. *See Brown Shoe*, 370 U.S. at 329, 82 S.Ct. at 1526. Indeed, respected scholars question the anticompetitive effects of vertical mergers in general. As one commentator phrases it: "Foreclosure does not, however, reflect an actual reduction in competition in any meaningful sense." Page, *Antitrust Damages and Economic Efficiency: An Approach to Antitrust Injury*, 47 U.Chi.L.Rev. 467, 495 (1980); *see also* 4 P. Areeda & D. Turner, *supra* ¶ 1004, at 211 (foreclosure argument has grave weaknesses; only where foreclosures reach monopolistic proportions—or threaten to do so—does a vertical merger become troublesome); R. Bork, *The Antitrust Paradox* 226, 237 (1978) ("Antitrust's concern with vertical mergers is mistaken. Vertical mergers are means of creating efficiency, not of injuring competition.... [The] foreclosure theory is not merely wrong, it is irrelevant."); Hovenkamp, *supra*, 35 Hastings L.J. at 961 (of all mergers, vertical acquisitions are the most likely to produce efficiencies and the least likely to enhance the market power of the merging firms).

A vertically integrated firm seeking to increase profits will engage in self-dealing if the supplying division's output cannot be more profitably sold elsewhere, or is not

more costly or inferior than the product of outside suppliers. *See* 4 P. Areeda & D. Turner, *supra*, ¶ 1004, at 222; R Bork, *supra* at 227–28; Hovenkamp, *supra*, 35 Hastings L.J. at 962. Because of post-merger efficiencies allowing it to purchase the acquiring company's output at a better price than in the marketplace, the acquired company's purchasing costs would fall—a procompetitive benefit capable of being passed on via lower prices for its products. Thus, in this scenario, post-merger self-dealing could result in efficiencies reflected in lower prices to the ultimate consumer.

Injuries to competitors of this nature should not be compensable under the antitrust law because they do not flow from the anticompetitive effects of a merger. Far from being caused by any post-merger market power, the competitor's losses would spring from the efficient aspects of the merger. *See Car Carriers, Inc. v. Ford Motor Co.*, 561 F.Supp. 885, 887–88 (N.D.Ill.1983) (conspiracy to stop dealing with plaintiff motivated by "Ford's desire to replace high-priced suppliers (plaintiffs) with a low-priced one"; losses flowing from termination are not the type of anticompetitive injury the antitrust laws were intended to forestall), *aff'd,* 745 F.2d 1101 (7th Cir.1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985); *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300 (5th Cir.) (franchisor's influencing of soft drink franchisee to assign franchise to firm other than plaintiff did not cause antitrust injury), *cert. denied,* 469 U.S. 833, 105 S.Ct. 123, 83 L.Ed.2d 65 (1984).

Nor is it helpful to characterize Du Pont's actions as designed to eliminate potential consumers for Alberta's methanol. From this perspective, Du Pont's "predatory" conduct could be viewed as an attempt to decrease the available outlets for Alberta's methanol in an effort to drive it from the methanol-producing market. Serious flaws exist with this theory, however, because Alberta has not proffered evidence that it will be forced from the merchant market as a result of Du Pont's cancellation of Conoco's methanol purchases there. *See Cargill,* 107 S.Ct. at 493; *Matsushita,* 106 S.Ct. at 1355 n. 8. Thus, Alberta cannot rely on quasi-"predatory" activities to establish antitrust injury under *Brunswick. See generally* R. Bork, *supra,* at 232 (predation through vertical merger is extremely unlikely). As the district court observed, Conoco's purchases in the merchant market in 1980 amounted to only 1.8% of sales in the United States. That percentage in itself is de minimis. The amount of the foreclosure is cut in half when one considers that in 1980 Du Pont sold Conoco 46% of its methanol consumption. In reality, the merger foreclosed less than 1% of the market.[7] *See United States v. Hammermill Paper Co.*, 429 F.Supp. 1271, 1282 (W.D.Pa.1977) (market share represented by the acquiring company's previous supply to the acquired firm is not part of the foreclosure). In reviewing these statistics we have assumed, *arguendo,* that Alberta has correctly defined the appropriate market to be the merchant market for methanol in the United States. We observe that Du Pont contends that the proper denominator should include methanol produced for internal operations, a factor which would dramatically reduce the foreclosure.[8]

Alberta has not alleged that the acquisition was part of a pattern of foreclosures in the methanol-consuming market, nor that the merger triggered a pattern of foreclosures which, in the aggregate, would cause harmful effects. *See Brown Shoe,* 370 U.S. at 332–33, 82 S.Ct. at 1528. Alberta contends that the methanol indus-

---

7. Alberta points to the fact that Conoco purchased only 6.2% of its consumption of 11.7 million gallons in 1979 from Du Pont, a total amounting to 2.1% of the merchant market. Alberta's own marketing plans made before the announcement of the merger anticipated sales to Conoco of only one million gallons in 1982. Even after the merger, however, Conoco bought methanol from outside sources and 81.5% from Du Pont. Therefore, the foreclosure of sales to Conoco in fact was not 100%.

8. *See* Areeda & Hovenkamp, 1986 Supplement § 520b 1, discussing the Department of Justice merger guidelines, "captive production and consumption of the relevant product by vertically integrated firms are part of the overall market supply and demand."

try as a whole is highly integrated; nevertheless plaintiff competes in the merchant market, where its losses allegedly occurred.

Since the merger, Alberta has freely sold to the rest of the merchant market and indeed has increased its annual sales in the United States from 38 million gallons in 1980 to 64 million gallons in 1984 and 83 million gallons in 1985.[9] The circumstances here differ considerably from *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 985 (5th Cir.1977), where a vertical merger virtually precluded the plaintiff from selling any of its products.

The case at hand more closely resembles *Fruehauf Corp. v. FTC*, 603 F.2d 345, 360 (2d Cir.1979), in which the court decided that a vertical integration foreclosing 5.8% of the market did not constitute an antitrust violation. The court of appeals concluded that, as a result of this foreclosure, "there would merely be a realignment of existing market sales without any likelihood of a diminution in competition." *Id.* at 360; *see also Crane Co. v. Harsco Corp.*, 509 F.Supp. 115, 125 (D.Del.1981) (vertical acquisition foreclosing 8.8% of market does not substantially lessen competition); *Crouse-Hinds Co. v. Internorth, Inc.*, 518 F.Supp. 416, 431 (N.D.N.Y.1980) (plaintiff must show anticompetitive effect as well as significant market foreclosure in vertical merger case under § 7); *United Nuclear Corp. v. Combustion Engineering, Inc.*, 302 F.Supp. 539, 557 (E.D.Pa. 1969) (foreclosures of 5.5% and 19% are "inconclusive" in determining § 7 violation). *See generally* 2 P. Areeda & D. Turner, *supra,* ¶ 527a (absent very high market concentration, a vertical merger may simply realign sales patterns between competitors of the merged and merging firms).

■ Because the district court assumed that a violation of § 7 existed, the posture of the appeal requires us to consider whether foreclosure could be the basis of an infraction here. We conclude that because of its de minimis consequences, the Du Pont acquisition and subsequent foreclosure of Conoco purchases from Alberta does not establish a § 7 violation.[10] Therefore, the loss of sales to Conoco flowing from the foreclosure does not satisfy the antitrust injury requirement as announced in *Brunswick.*

To recover damages in this situation, a private plaintiff must establish foreclosure of a sufficiently large share of the market to violate § 7. Having failed to do that in the present case, Alberta has not established antitrust violation or resulting injury. The fact that Du Pont had a large share in the market before the merger, moreover, does not transform a de minimis foreclosure into antitrust injury any more than Brunswick's superior financial ability turned its acquisitions into unlawful competition for smaller bowling alleys. *See Brunswick*, 429 U.S. at 487, 97 S.Ct. at 697. The same harm to Alberta would have ensued if a very small methanol producer had acquired Conoco and imposed total self-dealing.

If the merger were considered unlawful for reasons other than foreclosure of sales, the question then would become whether damages from the foreclosure flowed from the illegal act. Turning once again to *Brunswick*, we reiterate that plaintiff must establish that its harm was caused by that which makes the action unlawful. Assuming the merger violated the antitrust laws because it concentrated economic power in the production of methanol—as Alberta asserts—any resulting foreclosure from this concentration is but an incident of, and not a result of, the unlawful act. In this in-

---

**9.** Alberta contends that the figures for 1980 and 1981 were aberrational because of an antidumping action brought against it by Du Pont. The pretrial stipulation shows Alberta's U.S. sales as 39 million gallons in 1978, 59 million in 1978, and 49 million in 1977.

**10.** Judge Hunter agrees that the foreclosure is de minimis and does not establish a violation of

§ 7. Because he believes that the district court did not assume a § 7 violation as to the vertical claim, Judge Hunter would not address the additional question of whether Alberta was injured by the foreclosure. If the district court did assume a violation of § 7 in resolving the vertical claim, Judge Hunter would join in the court's opinion without that reservation.

stance, foreclosure losses are not antitrust injury.

For these reasons, we conclude that Alberta has not alleged antitrust injuries from the vertical aspects of the Du Pont-Conoco merger.

## V.

In addition to its treble damage claims, Alberta also seeks an injunction under § 16 of the Clayton Act, 15 U.S.C. § 26, dissolving the Du Pont-Conoco merger. For the reasons that Alberta's treble damage claims fail under *Brunswick*, summary judgment is appropriate for Du Pont on Alberta's claims for injunctive relief as well.

## VI.

In sum, because plaintiff has not presented evidence of antitrust injury, we will affirm the district court's grant of summary judgment for Du Pont.[11]

BECKER, Circuit Judge, dissenting.

This case is before us on appeal of the trial judge's grant of summary judgment for defendants. The facts alleged are quite simple, and the majority has fairly presented them. But the majority appears to have misconceived the plaintiff's claims. It responds to Alberta Gas's arguments with a variety of correct but, in my view, irrelevant legal principles, so that I have had difficulty ascertaining the grounds on which the district court has been affirmed. I therefore set out a brief summary of plaintiff's case which will help explain why I believe the majority has reached the wrong result.

Alberta Gas is a Canadian company which makes methanol. Conoco was an American company with vast coal resources. In 1980, Conoco had firm plans to invest $1 billion in a plant that would transform coal into methanol. Gasoline prices were high in 1980, and Conoco intended to make methanol an automotive fuel as popular as gasoline. In order to stimulate the demand for the millions of gallons of methanol which its new plant was to·produce, Conoco intended to create a large network of retail methanol distributors. The size of this network would induce consumers to begin to buy methanol-burning automobiles instead of cars using gasoline, so that when Conoco's plant was ready to produce methanol, a market for the product would be in place. Alberta Gas contends that to operate this network before its own product could be sold through it, Conoco would have bought methanol from a number of other suppliers, including Alberta Gas. In the long run, the argument goes, Conoco's methanol advertising blitz and its efforts to induce people to substitute methanol for gasoline would have dramatically expanded the demand for the product, and its market price would have risen. Alberta Gas would benefit from the rise in price and demand.

Alas, along came DuPont, which manufactured approximately 25–30% of the methanol used in the United States. DuPont used half of this methanol itself and sold the other half in the "merchant" (i.e. spot) market. DuPont acquired Conoco. DuPont then terminated Conoco's plans to invest in the methanol market. Alberta Gas claims that DuPont did so to protect its own monopoly position in that market.

### I. The Horizontal Claim

This is not the most believable story about the conduct of rational actors in the marketplace, because it is far from clear that it would make economic sense for DuPont to have behaved as Alberta Gas alleges it did.[1] I would therefore have sympa-

---

**11.** Because we affirm the grant of summary judgment for the defendant, we need not discuss the denial of the plaintiffs' motion for summary judgment.

**1.** It should be noted, however, that the record contains very strong evidence that Conoco was indeed committed to develop a coal-to-methanol plant, as Alberta Gas alleges. Indeed, Conoco's

plans to develop methanol were sufficiently firm that immediately before the merger, Conoco had begun advertising those plans to the public. See Appellant's opening br. at 12, citing A 7459, the text of a television advertisement broadcast during the 1981 Indianapolis 500 auto race, which stated that "Conoco will soon be testing passenger cars powered by methanol,

thized with the district court if it had found that the record justified the grant of summary judgment on the ground that Alberta Gas had not put forth enough evidence to make it likely that this arguably improbable story is true. I would be the last one to claim that summary judgment cannot be granted in an antitrust case on that basis. See *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 513 F.Supp. 1100 (E.D.PA 1981), reversed, 723 F.2d 238 (3d Cir.1983), reversed, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

But the district court did not grant summary judgment on this ground, and DuPont does not advance the *Matsushita* approach as a ground for affirmance.[2] The district court in this case held that plaintiffs had no *standing* to pursue their claims because it believed that plaintiffs had not alleged that they incurred "antitrust injury" as that term is defined in *Brunswick Corp. v. Pueblo Bowl-O-Mat Corp.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). That theory—not the belief that the plaintiffs have failed to support an implausible theory, and so should not reach a jury—is also the basis on which this Court now affirms the grant of summary judgment. That is an entirely different matter.

I believe that the majority's result rests on a misconstruction of *Brunswick* and the more recent case of *Cargill Inc. v. Monfort of Colorado,* —— U.S. ——, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). In order to explain my view, I begin by pointing out that there is a set of facts under which it would make economic sense for DuPont to behave as Alberta Gas alleges it did. This explanation helps to clarify the fact that DuPont's alleged actions were socially de-trimental—i.e. anticompetitive—so that Alberta Gas has standing under *Brunswick* to challenge that activity. That set of facts is essentially as follows.

Assume that DuPont, as a participant in the oligopolistic market for methanol, is earning monopoly rent of $1 per unit on each of the 100 units of methanol it sells: total monopoly rent then equals $100. Assume further that if Conoco were to succeed in its plans to increase the demand for methanol, the number of units DuPont could sell would be 1000. Assume, however, that the market would then be much more competitive (more suppliers would enter the market, and there would be more competition, so that the difference beteen price and marignal revenue would fall even though price might rise). Then DuPont might earn only a penny in monopoly rent per unit, instead of $1. Total monopoly rent would now be $10 instead of $100 ($.01 × 1000 = $10.00 instead of $1 × 100 = $100). Alberta Gas alleges that DuPont killed Conoco's plans to prevent this from happening.

Alberta Gas seeks damages for two kinds of injuries.[3] First, Alberta Gas sues for the loss of the sales it would have made to Conoco before Conoco's plant came on line, of the methanol Conoco would have used to set up its network of methanol distributors. Because the plan was terminated, plaintiff allegedly lost this business. In Count I Alberta Gas complains about this loss, which it calls the "vertical injury."[4] But see discussion below, typescript at 14–15.

Second, Alberta Gas says that the increase in demand Conoco would have produced would have driven up both the consumption and the price of methanol over

---

and we're planning to produce this fuel from coal."

**2.** This Court may review the record independently to determine whether there is an alternative ground for affirmance. But I believe that the size of this record suggests that that task be performed in the first instance by the district court.

**3.** While the complaint also seeks injunctive relief, Alberta Gas did not seek a preliminary injunction. My understanding is that, at this juncture, Alberta Gas is interested primarily in money damages.

**4.** The majority concentrates its discussion of the vertical claims on the sales Alberta Gas would have made to Conoco if the latter company had not closed down its chemical manufacturing plants in New Jersey and Texas. As I explain more fully below, see typescript at 12–15, I do not understand Alberta Gas to focus on this point.

the long term. Alberta Gas has access to a large supply of natural gas, so that its costs are both constant and low. Alberta Gas complains that this rise in consumption and price would in turn have meant an increase in Alberta Gas's profits, and that DuPont's termination of the project took those profits away. This claim the parties have denominated the "horizontal injury."

With respect to the horizontal claim—that demand would have been stimulated and prices increased, thereby boosting Alberta Gas's profits—both the defendants and the majority believe that Alberta Gas has not alleged that it sustained the right kind of injury. They reach this conclusion because they focus on Alberta Gas's complaint that it would have benefited from a price rise rather than a price fall. DuPont and the Court reason that since lower prices are always in the interest of the consumer plaintiff's allegation that it suffered from the failure of prices to rise is really nothing but an allegation that plaintiffs suffered from procompetitive activity. This reasoning is simplistic and incorrect.

In order to have standing to sue under the antitrust laws a plaintiff must be complaining of an injury

> of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). In *Brunswick*, plaintiff attacked a merger under § 7 which defendants conceded, arguendo, was illegal. Plaintiffs were bowling centers in competition with some of the centers illegally acquired by defendant. Plaintiffs claimed that had defendant not made the illegal acquisition, the lanes plaintiffs competed with would have gone out of business, and that as a result plaintiffs' profits would have risen. The Supreme Court therefore held that a complaint about a loss of profit caused by the acquisition was not a complaint about antitrust injury. The plaintiff in *Brunswick* did not allege that the merged entity was going to engage in any predatory conduct.

DuPont argues here that Alberta Gas is really only complaining about the fact that the price for methanol did not rise, and that such harm cannot constitute antitrust injury. While it is true that Alberta Gas is complaining about lost profits, the profits were allegedly lost not because DuPont preserved or increased competition—as the defendant in *Brunswick* was alleged to have done—but because DuPont *eliminated* competition. The things Conoco allegedly would have done—investing in a new plant and stimulating demand to ensure that there would be a market for that plant's product—are procompetitive, socially beneficial activities. The prevention of those activities causes a decrease in social welfare. Alberta Gas was allegedly injured by that decrease in social welfare.

Thus the majority is simply—and crucially—incorrect when it states, slip op. at 1243, that "[f]rom the consumer's standpoint, the development that Alberta anticipated and the basis for its claim—an increase in methanol price—would prove distinctly disadvantageous." A rise in price is harmful to consumers if it represents only movement along an unchanged demand curve—a movement from point A to point B on the graph below. But here the rise in price would have been caused by a shift to the right of the demand curve—a movement from point A to point C. This shift in the demand curve indicates that the commodity sold has become more useful to consumers.

Such a change is indeed socially beneficial, and therefore procompetitive, not anticompetitive and harmful.[5] This shift would also benefit Alberta Gas in the long run, increasing its profit, even though it might harm DuPont, lowering its profit, for the reasons I have set out at typescript at 1–2.

The majority thus has no basis to invoke *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1354, 89 L.Ed.2d 538 (1986), for the proposition that "competitors cannot recover antitrust damages for a conspiracy to impose nonprice restraints that have the effect of either raising market price or limiting output." The Supreme Court's point there was that one seller in a market will not be injured by anticompetitive activity which, *while the demand curve remains unmoved,* raises the market price. But here the practice which would have raised price was not anticompetitive, such as "a conspiracy to impose nonprice restraints;" rather, it is alleged here that price would have risen as a result of procompetitive activity which would have stimulated demand. *Matsushita* says nothing about a

5. The majority's error in focusing on the rise in price can also be seen clearly from the fact that Alberta Gas's complaint about lost profits would be essentially the same even if the market price for methanol did not rise at all. If all suppliers produced methanol with the same cost structure as Alberta Gas—i.e., at constant marginal cost—the market price would not have risen at all in response to an increase in demand. But profits would still have risen if demand increased. As the graph below explains, profits would have risen from the amount represented by area A to the sum of that area and area B. And Alberta Gas would still have lost profits as a result of DuPont's anticompetitive actions.

competitor's standing to protest the elimination of procompetitive activity.

This discussion also explains why the majority is wrong in characterizing plaintiff's complaint as an attempt to recoup "windfall profits." See majority opinion at 1243. The authorities cited by the majority—*Matsushita* once again, and a law review article about *Brunswick*—characterize as a "windfall" the benefits that one competitor in a market would have received if another competitor engaged in *anti*competitive conduct which raised the market price. Here the allegation is that the price would have risen as a result of *pro*competitive activity. A benefit from increased competition is not a windfall; it is exactly the kind of benefit which the antitrust laws were intended to preserve. This is no less true simply because one of the beneficiaries of this competition is a competitor.

The majority also seeks support from an argument made in *Brunswick*, but I believe that the majority has misconstrued that argument and so misuses it here. To help identify what it meant by "antitrust injury," the Supreme Court in *Brunswick* pointed out that the plaintiffs in that case would have been injured in exactly the same way if the bowling alleys with which they competed had been acquired by someone other than defendant. The Court thus observed that "[r]espondents would have suffered the identical 'loss'—but no compensable injury—had the acquired centers instead obtained refinancing or been purchased by 'shallow pocket' parents." 429 U.S. at 487, 97 S.Ct. at 697. The majority attempts to make the same point in this case, arguing that if Conoco had been acquired by another company, not in the methanol market, and that company had terminated Conoco's plans to make these investments, then Alberta Gas would have suffered in exactly the same way. In that set of circumstances, DuPont concludes and the plaintiff concedes that the merger would not have been illegal under § 7. The anticompetitive motivation which Du-

Pont allegedly had here would have been absent. The majority therefore concludes that plaintiff has not alleged antitrust injury.

I believe the majority's argument is wrong because it misstates the manner in which the law uses intent to explain the significance of anticompetitive activity. If another company had bought Conoco and terminated the plans, it would have done so because the plans were unwise. DuPont claims that that is why it, too, terminated the plans. But plaintiff claims that DuPont eliminated the plans to protect Du-Pont's market power in the methanol market. If that is why DuPont did what it did, then another purchaser probably would not have terminated the investment plans. Du-Pont's alleged intention indicates the anticompetitive effect of its actions. While the antitrust laws regulate conduct, as distinguished from intentions, Justice Brandeis explained long ago that

> the reason for adopting the particular remedy [and] the purpose or end sought to be attained ... are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge or intent may help the court to interpret facts and to predict consequences.

*Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

Alberta Gas is arguing that DuPont's actions have had an anticompetitive effect. Justice Brandeis' statement in *Chicago Board of Trade* demonstrates that both the fact that DuPont (rather than another company) bought Conoco, and DuPont's reason for buying Conoco, are relevant evidence of the purchase's ultimate effect. The fact that no anticompetitive results would have ensued if Conoco had been bought by General Foods is irrelevant, and does not provide a basis for dismissal for lack of standing in view of Alberta Gas's allegations about DuPont's intentions.[6]

---

**6.** I also do not understand the majority's *Brunswick*-based argument that Alberta Gas's claim offends the principle that a plaintiff's injury in a

§ 7 case must stem from that which makes the merger illegal. See majority opinion, typescript at 16–17, citing *Brunswick*, 429 U.S. at 487 n. 12,

Finally, defendants and the majority draw support for their conclusion that plaintiff lacked standing from the Supreme Court's recent opinion in *Cargill, Inc. v. Monfort of Colorado,* — U.S. —, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). There the Court held that Monfort had no standing to challenge a merger when it alleged that the merged entity would lower prices because the plaintiff had not alleged that the defendants would engage in predatory pricing—i.e. pricing below cost.

In the course of that opinion, however, Justice Brennan explicitly warned against precisely the error now made by the majority. The Justice Department, as amicus curiae, argued that no plaintiff should ever have standing to challenge a merger on grounds that the merged entity would engage in predatory pricing because the Justice Department thought that predatory practices are economically irrational and therefore that businesses would virtually never engage in them. Justice Brennan rejected flatly this contention, however, holding:

> While firms may engage in the practice only infrequently, there is ample evidence suggesting that the practice does occur. It would be novel indeed for a court to deny standing to party seeking an injunction against threatened injury merely because such injuries rarely occur.

107 S.Ct. at 495 (footnote omitted). The majority here has held squarely that Alberta Gas lacks standing because the actions it challenges would only rarely be anticompetitive. The Supreme Court has just told us that is wrong.

*II. The Vertical Claim*

I also believe the majority has completely misconstrued the plaintiff's "vertical" claim for damages. The plaintiff primarily complains about the sales it would have made to Conoco if Conoco had gone through with its plans to build a large network of methanol dealers. The majority has rejected that claim on the ground that as things turned out—i.e. in light of the fact that Conoco's plans were terminated—Conoco bought only a small amount of methanol on the open market, to fill the methanol demand of its chemical plants; the majority therefore concludes that Alberta Gas's claim is de minimis. Since no significant damages have been alleged, holds the majority, summary judgment was properly granted for defendant. See majority opinion, typescript at 1245.

With respect, the majority has missed the point. Plaintiff is not complaining about the fact that once Conoco's coal gasification plans were terminated. Conoco purchased only a bit of methanol on the open market and that Alberta Gas got none of *that* business. Plaintiff's point is that *if DuPont had not purchased Conoco and terminated the coal gasification plans,* Conoco would have bought much more, and that Alberta Gas would have sold Conoco much of that increment. I have no idea whether or not that in fact would have happened, but if Alberta Gas is right it has certainly stated a non de minimis claim for damages.

Once this point is clear it is also apparent that the majority errs in relying on the doctrine that vertical mergers cannot be anticompetitive. See majority opinion, typescript at 1245, citing William H. Page,

97 S.Ct. at 697 n. 12. The majority observes that if DuPont later decides to go through with Conoco's plans to develop a coal-to-methanol plant, Alberta Gas will receive the same profits it would have received if Conoco had developed the plant itself. See majority opinion, typescript at 17. The majority concludes from this that "Alberta's injuries were not proximately caused by the anticompetitive effects of the DuPont-Conoco merger, [so that] they do not flow from" that which made the merger illegal under § 7 of the Clayton Act. The majority's point appears to be that because DuPont could have

decided after the merger to continue with the plans, the merger itself is not the source of Alberta Gas's injury.

Alberta Gas's point is that the merger was illegal because DuPont used it as a means to eliminate Conoco's coal-to-methanol plant. If DuPont had bought Conoco and continued Conoco's plans to build the plant, the merger would not have been illegal in the first place. The thing which made the merger illegal is therefore the thing which caused Alberta Gas's injury.

*Antitrust Damages and Economic Efficiency*, 47 U.Chi.L.Rev. 467 (1980); Phillip Areeda and Donald F. Turner, *Antitrust Law* § 1004; Robert H. Bork, *The Antitrust Paradox* 226 (1978). Those authorities hold that there is nothing anticompetitive about a vertical merger in which a downstream purchaser of a given product merges with a producer of that product, so that the downstream purchaser's needs are satisfied entirely within the merged entity instead of being filled on the open market. The assumption in that situation is that the magnitude of the downstream user's demand remains the same before and after the merger; the only thing that changes is the identity of the supplier. These authorities say, and I certainly agree, that such a change in the name of the seller is not likely to be anticompetitive.

In this case, by contrast, Alberta Gas is not complaining simply that demand which it could have filled is now being filled by DuPont. Alberta Gas is complaining that demand which it could have filled now does not exist, because DuPont terminated the project which would have given rise to the demand. The theory of vertical foreclosure says nothing one way or the other about that argument. It certainly does not hold that the elimination of such new demand has no anticompetitive consequences. And I have already explained why DuPont's actions may indeed have had anticompetitive effects.

Put another way, Alberta Gas alleges that this is not a vertical merger at all but a horizontal one, in which both companies sell—or were about to sell—methanol. Under this analysis, arguments from the economics of purely vertical mergers are entirely irrelevant.

As DuPont itself has argued, the vertical and horizontal claims are really two parts of a single violation of § 7,[7] and I suspect that the majority mischaracterizes Alberta Gas's vertical claims because it misconceives and rejects the horizontal theory. Having decided that Alberta Gas may not sue on DuPont's elimination of Conoco's plans to expand demand, the majority ignores the purchases Conoco would have made from Alberta Gas as a part of those plans. Having ignored those purchases, the majority concludes that there are no vertical damages.

If the demand creation theory is recognized as valid, however, as I have argued it should be, it is also apparent that the vertical claim involves quite a substantial injury rather than the de minimis damages which the majority finds. Thus the majority's error on the vertical theory is simply a compounding of its mistake concerning the vertical claim.

### III. Actual Potential Competition

Because I believe that plaintiff has alleged that it suffered antitrust injury, I believe we also must reach a question about the law on potential competition which defendant offers as an alternative ground for affirmance, see Appellee's br. at 40 n. 34. The issue has been raised many times in litigation, but no appellate court has ever squarely faced it.

In *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973) and *United States v. Marine Bancorp.*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974), the Supreme Court theorized that two kinds of potential competition might be within the reach of Clayton Act § 7, which prohibits mergers and acquisitions by one company of another if "the effect of such acquisition may be substantially to lessen competition." Under the first theory, "perceived potential competition," the Supreme Court held that competition might be diminished if a company which industry participants had thought might actually enter the market on its own instead simply acquired a company already in that market.

[T]he Court has interpreted § 7 as encompassing what is commonly known as the "wings effect"—the probability that the acquiring firm prompted premerger procompetitive effects within the target market by being perceived by the existing firms in that market as likely to

enter *de novo*. *Falstaff*, [410 U.S.] at 531–537 [93 S.Ct. at 1099–1103]. The elimination of such present procompetitive effects may render a merger unlawful under § 7.

*Marine Bancorp.*, 418 U.S. at 625, 94 S.Ct. at 2871 (footnote omitted). Perceived potential competition focuses on the premerger effect on prices of the perception that if profits rise, a new company will enter the market and drive down both prices and profits.

The Court has also discussed a second kind of potential competition, which has been called "actual potential competition." In *Marine Bancorp.* the Court observed that it

> has not previously resolved whether the potential competition doctrine proscribes a market extension merger solely on the ground that such a merger eliminates the prospect for long-term deconcentration of an oligopolistic market that in theory might result if the acquiring firm were forbidden to enter except through a *de novo* undertaking or through the acquisition of a small existing entrant (a so-called foothold or toehold acquisition). *Falstaff* expressly reserved this issue.

Id. (footnote omitted). The actual potential competition doctrine concerns the elimination of a company which would otherwise have entered the market either by itself or by acquiring a small company and infusing capital into it. Actual potential competition relates to the effect such a new entry—and its elimination—would have had on prices.

I believe this case forces us to address that question. The issue presented here is slightly different, but I think the differences are irrelevant. This case requires us to assess the legality of a merger which prevented the acquired firm from entering a market which the plaintiff claims the acquired firm would otherwise have entered. Here Alberta Gas argues that, had DuPont not acquired Conoco, Conoco would have proceeded with its plans to enter the methanol market. This claim is not identical to the one made in *Marine Bancorp.*, because here plaintiff does not claim that, but for the acquisition, DuPont would have entered the methanol market itself or made a "toe-hold" acquisition. But, as in *Marine Bancorp.*, the claim is that the merger eliminated a company which would otherwise have actually entered the methanol market.

No court has yet decided whether § 7 authorizes a claim that a merger is illegal because it eliminated actual potential competition. The Supreme Court in *Marine Bancorp.*, and three courts of appeals, have established the elements of such a claim but have never found them all satisfied, so these courts have never actually had to hold that satisfaction of the doctrine's requirements constituted a violation of § 7. See *Tenneco, Inc. v. F.T.C.*, 689 F.2d 346, 352–55 (2d Cir.1982); *United States v. Siemens Corp.*, 621 F.2d 499, 506 (2d Cir.1980); *Republic of Texas Corp. v. Board of Governors*, 649 F.2d 1026, 1048 (5th Cir. Unit A 1981) (discussing Clayton Act standard incorporated into § 3 of the Bank Holding Company Act); *Mercantile Texas Corp. v. Board of Governors*, 638 F.2d 1255, 1265 (5th Cir. Unit A 1981) (same; stating that the actual potential competition "doctrine has logical force and is consonant with the language and policy of the Clayton Act" but that "[i]n the absence of necessary findings by the Board, however, we will not decide whether the doctrine adequately describes a violation of the Clayton Act standard" incorporated into the Bank Holding Company Act); *F.T.C. v. Atlantic Richfield*, 549 F.2d 289, 293–94 (4th Cir.1977); see also Donald F. Turner, *Conglomerate Mergers and Section 7 of the Clayton Act*, 78 Harv.L.Rev. 1313, 1362–86 (1965) (describing and supporting the doctrine). It seems quite likely, however, that if a case were to come along which presented all the elements of the claim, the courts would decide that the claim is a valid one under § 7. I think this is such a case.

As it is usually presented, the elements of an actual potential competition claim are that

> 1. the relevant market is oligopolistic;
>
> 2. absent the acquisition, the acquiring firm would have entered the market in

the near future either *de novo* or through acquisition of a little company; and

3. such entry by the acquiring firm carried a substantial likelihood of ultimately producing deconcentration of the market or other significant procompetitive effects.

*Tenneco, Inc. v. F.T.C.* 689 F.2d 346, 352 (2d Cir.1982), citing *Marine Bancorp.*, 418 U.S. at 630, 94 S.Ct. at 2874, and a number of other circuit court cases.

I think that Alberta Gas has properly alleged each of these elements. Defendant agrees that the relevant market is oligopolistic; during the relevant time period two firms controlled 50%, four firms 70%, and nine firms essentially 100% of the industry.

The second claim is a bit tricky. In the typical potential competition case the alleged potential competitor is the acquiring firm. Here the alleged potential competitor is the acquired firm, Conoco. The § 7 cases are not structured this way, and no cases like this appear to have been brought under §§ 1 and 2. But this difference in structure certainly should not make any difference in result; the fear is still that an entrant into the market is being eliminated. Indeed, insofar as the difference matters at all it suggests that the actual potential competition doctrine is more fitting here than in the typical case. In most instances the difficulty comes in proving that, but for the challenged acquisition, the acquiring firm would have entered the market in some more socially beneficial way. Here there is no question that Conoco was about to enter the methanol market in a big way and that DuPont's purchase of Conoco prevented that entrance.

I also think that Alberta Gas has adequately alleged the third element of a successful claim. DuPont has attacked this aspect of Alberta Gas's case by arguing that plaintiff has not alleged the loss of "procompetitive effects," though DuPont has cast this argument in the standing context. I have already explained why I believe that argument is wrong.

Conclusion

For the foregoing reasons I would reverse the grant of summary judgment on standing grounds and remand this case to the district court. I would instruct that this remand is without prejudice to a renewed summary judgment motion, made on the ground that the record did not contain sufficient evidence to warrant putting plaintiff's case before a jury.